**In re CAJUN ELECTRIC POWER COOPERATIVE, INC., Petitioner.**

**CAJUN ELECTRIC POWER COOPERATIVE, INC., Plaintiff-Appellant,**

**v.**

**RILEY STOKER CORPORATION, et al., Defendants-Appellees.**

Nos. 85–3314, 85–3366.

United States Court of Appeals, Fifth Circuit.

June 9, 1986.

Reuben L. Hedlund, Deborah C. Paskin, Latham & Watkins, Chicago, Ill., Gene W. Lafitte, John M. Wilson, Bruce V. Schewe, Robert E. Holden, Liskow & Lewis, New Orleans, La., for Riley Stoker Corp., & its sureties.

William P. Wray, Eric S. Kracht, M. J. Bodenhamer, Wray, Robinson & Kracht, Baton Rouge, for Cajun Electric Power Cooperative, Inc.

Before GOLDBERG, HILL, and JONES, Circuit Judges.

IRVING L. GOLDBERG, Circuit Judge:

This case involves a $76 million contract in which Riley Stoker Corporation agreed to construct two coal-fired steam genera-tors for Cajun Electric Power Cooperative, Inc. The contract contained a provision requiring the parties to submit to arbitration any claims or disputes arising under the contract. Some eight years after the signing of the contract such a dispute did arise, and Riley Stoker sought arbitration. Cajun responded that it had not realized an arbitration clause was contained in the contract and that the arbitration clause was therefore null and void. The district court below, Polozola, J., rejected this argument and ordered arbitration. We affirm.

## I. FACTUAL AND PROCEDURAL BACKGROUND

Cajun Electric Power Cooperative, Inc. ("Cajun") is a Louisiana corporation that generates, sells, and distributes electrical power. In the fall of 1974 Cajun issued bid invitations to Riley Stoker Corporation ("Riley") and other utility boiler manufac-turers for the construction of two coal-fired steam generators. Cajun provided bid forms that were to be filled out, returned, and eventually incorporated in a final con-tract. Bidders were instructed to furnish "other data required in the attached forms" and to have same "executed by a responsible and authorized officer of the company."

This was a "design-and-build" contract. "That is, the Technical Specifications de-scribed and defined only the general pa-rameters of the boiler, leaving the specifics of design, fabrication and erection to the expertise of the boiler manufacturers. The Bid Documents called for each bidder to supplement the proposal forms with other technical data to 'explain the bid.'" Appel-lant's Brief at 6. The "Notice and Instruc-tions to Bidders" section of the contract sets forth the procedures to be followed by bidders in submitting responsive bids. A subsection entitled "Manufacturer's Data Submitted with Bid" states in part that "Proposals shall include prints of the man-

ufacturer's data called for in the Specifications in addition to any other data submitted by the Bidder to explain his bid."

Riley submitted its bid to Cajun under cover letter of January 7, 1975. In making its bid Riley supplied the necessary information on the Cajun contract documents and included a section entitled "Riley Stoker Corp. Proposal No. 53020" as part of the contract; this Proposal contained the disputed arbitration clause. After receiving all the bids, Cajun held negotiation sessions with each of the bidders, as provided for in the "Notice and Instructions of Bidders" section of the contract ("The Owner ... may elect to conduct a round of negotiations with each bidder to resolve any questions related to the substance of his proposal").[1] Negotiation sessions were held with Riley on February 24 and March 17, 1975.

Cajun awarded the steam generator contract to Riley on April 1, 1975, and issued a formal "letter of intent" on April 10, 1975. Thereafter, representatives of Cajun and Riley met "on numerous occasions," Appellant's Brief at 9, to discuss the contract. On July 17, 1975, Riley submitted a revised version of Proposal 53020, including the original arbitration clause, for inclusion in the contract documents.

Riley signed the final agreement known as Contract G2–2 on August 18, 1975. On September 23, 1975, Cajun's President signed the agreement. That same day Cajun's Board of Directors formally ratified Contract G2–2 by passing the following resolution:

> BE IT RESOLVED that the Board of Directors of Cajun Electric Power Cooperative, Inc., in regular session convened, does hereby approve and ratify the awarding to Riley Stoker Corporation of Contract G2–2 for boiler purchase with respect to the Big Cajun No. 2 generating facility, in an original contract amount of $75,949,500, the effectiveness thereof to be conditioned upon approval

by the Administrator of the Rural Electrification Administration.

The Rural Electrification Administration ("REA"), which was lending Cajun the funds for the project, approved the contract on April 27, 1977.

At the beginning the final contract is a "List of Contents," which states, at the very top: "The following lists all the pages which constitute the contract." The "List of Contents" covers seven separate contract documents, each separately paginated: 1) REA Form 200 (Modified): Construction Contract—Generating (Alternate Bid); 2) General Conditions; 3) Special Conditions; 4) Appendix A; 5) Technical Specifications S–3183–2 for Steam Generators; 6) Bidding Schedules; 7) Riley Stoker Corp. Proposal No. 53020–75034, dated December 27, 1974 and revised June 20, 1975. The pages encompassed by each of these contract documents are entered in the List of Contents under the titles of their respective documents.

Page 12 of the first contract document, REA Form 200 (Modified), contains the following provision:

> 11. *Contract is Entire Agreement.*
> The Contract to be effected by the acceptance of the Proposal shall be deemed to include the entire agreement between the parties thereto, and the Bidder shall not claim any modification thereof resulting from any representation or promise made at any time by any officer, agent or employee of the Owner or by any other person.

Page 4 of the General Conditions document contains a similar provision:

> 1.5 *Contract Documents Embody Entire Agreement.*
> The Contract Documents embody the entire agreement between Owner and Contractor. Owner and Contractor represent that in entering into this Contract they do not rely upon any previous oral, written or implied representation, endorsement or understanding of any kind.

---

1. *Cf.* Memorandum from Benjamin Jankowski, Jr., Chief of the REA's Power Plants Branch, to Rowland C. Hand, Sr., Director of the Power

Supply and Engineering Standards Division (Dec. 21, 1976) ("Negotiations were held with each vendor to clarify its proposal.").

Any modification of the Contract shall be in writing and executed in the same manner as the Contract. The Contract shall be binding upon and inure only to the benefit of the parties hereto and their legal successors, representatives and assigns.

The pages encompassed by the seventh contract document, Riley Stoker Corp. Proposal No. 53020, are listed both in the general "List of Contents" and in a separate Index at the beginning of the Riley Proposal. A page 29 is included in both listings. In the Index to the Riley Proposal the title "Final Page" appears opposite the number 29. The heading "ARBITRATION" appears at the top of page 29 of the Riley Proposal, followed by:

Any controversy or claim arising out of or relating to this contract, or the breach thereof, shall be settled by arbitration, in accordance with the Rules of the American Arbitration Association, and judgement [*sic*] upon the award rendered by the arbitrators may be entered in any Court having jurisdiction thereof.

This contract is made in Worcester, Massachusetts

Respectfully submitted,
RILEY STOKER CORPORATION
BY /s/ J.E. Hicinbothem

THE FOREGOING PROPOSAL IS HEREBY ACCEPTED.

_____
(Purchaser)

DATE _____ 19__ BY _____

APPROVED AS OF _____ 19__

RILEY STOKER CORPORATION
BY _____

The remainder of the page is blank, except for the notation "Final Page (29)" at the very bottom.

"[P]age 29 of Riley's 'Proposal Number 53020' contained ... the required signature of an 'authorized officer of the company'.... In accordance with previously-quoted portions of the Bid Documents, Riley's ... Proposal 53020 ... was incorporated into the final version of Contract G2-2. [T]he quoted arbitration clause ...

remains on the signature page of Riley's 'Proposal No. 53030', which was bound in toto into the Contract Documents." Appellant's Brief at 8, 10.

Construction on the project began in 1975. On December 30, 1983, Cajun instituted a civil action in the United States District Court for the Middle District of Louisiana, alleging delays and deficiencies in the construction and seeking damages in excess of $200 million. On February 21, 1984, Riley filed a Petition to Compel Arbitration under 9 U.S.C. 1 *et seq.*, the United States Arbitration Act, and a Motion to Dismiss or Stay Proceedings Pending Arbitration. On March 12, 1984, Cajun opposed defendants' petition and motion, alleging in part:

3. The agreement between Plaintiff-Respondent and Riley Stoker Corporation contained no agreement, written or otherwise, to settle by arbitration any disputes arising therefrom.

4. The inclusion, listing or reference to page 29 of the Riley Stoker Corporation proposal 53020–75304 (which purportedly refers to arbitration) was the result of a clerical error and mistake in compilation of documents and an accidental happening at best; the same was not authorized by the parties, is contrary to the intent of the parties, and not indicative of or consistent with the agreement between the parties.

5. Plaintiff-Respondent alleges a lack of mutuality of assent as to the arbitration language contained in the page 29 of the Riley Stoker proposal.

6. The parties to the contract sued upon have manifested no consent to arbitrate their disputes, and the persons compiling the construction documents and the signatories thereto lacked authority and capacity to bind their respective employer-principals to an arbitration agreement.

7. Alternatively, Plaintiff-Respondent alleges that the clause contained in page 29 is a "needle in a haystack" placed by Riley Stoker within and among data of a highly technical nature, improperly in-

dexed and not as an "arbitration clause" nor a matter related to resolution of disputes; and is contrary to provisions in the contract which were clearly marked, designated, and agreed upon as the means and methods for resolution of claims and disputes.

Cajun demanded an evidentiary hearing, trial by jury, and full discovery.

The district court, Polozola, J., heard oral argument in the case on July 20, 1984, and on January 24, 1985, the court issued a Minute Entry setting the date for an evidentiary hearing. Thereafter, however, the court, being undecided as to whether an evidentiary hearing was in fact required, permitted extensive discovery and allowed the parties to reargue the matter on April 17, 1985. On May 18, 1985, the court issued a Minute Entry concluding that "the contract entered into between the parties requires the parties to arbitrate the dispute at issue in this case" and ordering a stay of proceedings in the case pending arbitration. On June 17, 1985, the court issued an Opinion assigning "additional reasons to support its May 18, 1985 decision."

Cajun filed both a Notice of Appeal and a Petition for Writ of Mandamus in this court. The motions panel of this court consolidated the mandamus proceedings with the appeal by order of July 15, 1985.

## II. THE LEGAL EFFECT OF THE ARBITRATION CLAUSE

Cajun now comes before this court to maintain that "the parties did not agree to submit contract disputes to arbitration, notwithstanding the physical presence of an arbitration clause among the 'Contract G2–2' documents." Appellant's Brief at 11. We find this proposition incredible as a factual matter and untenable as a legal position. Evidently, the trial court below shared some of our incredulity:

[T]he evidence reveals that even after the last proposed contract was compiled by Cajun, whether it was by the clerical people or otherwise, somebody went back and read it, the contract, because they pulled certain pages out of it and made corrections and initialed it. So there is no question that even at the end, it wasn't a situation where one person signed it, ran it over to the other party, and the other party signed it. The evidence reveals that even after nine months of negotiations, even after putting it together—Cajun's putting it together, Cajun still reviewed it, because it's obvious they reviewed it because they initialed certain changes that were made after they had compiled it. And then, the final agreement was made. But it just didn't even stop there, and this is why I have the problem, now that I've seen the whole picture, differently from what I saw in January.

Even after the review, even after the review by the parties who negotiated the contract and actually signed the contract, it then goes before the Board of Directors. Okay? And if you look at the resolution and the minutes of that meeting, it wasn't a situation where there was some confusion among the parties as to whether we're dealing with the first proposal, or the second proposal, the deviation, somebody else's proposal. It didn't even say that. It said—and the resolution is up there and I don't have the exact language, but, you'll see it says: this document is what we're approving.

Transcript of Proceedings (Apr. 17, 1985) ("Tr. 2"), at 40–41.

The arbitration clause was not hidden or "buried" in the complicated and often technical contract documents prepared and compiled by Cajun and Riley. The page on which the arbitration clause appears is clearly listed as part of the contract in two separate indexes: one at the beginning of the whole contract, and the other at the beginning of the Riley Proposal. The arbitration clause appears, under the heading "ARBITRATION," on the signature page of Riley's Proposal, directly above the required signature of the "authorized officer of the company" called for in Cajun's instructions. If the arbitration clause was indeed the "blooper" Cajun says it is, then

even a mildly attentive legal aide should have been able to spot it easily ("from across the room," we are tempted to add). Certainly, anyone who bothered to flip through the proposal—to see, *e.g.*, if it had even been signed—would not fail to notice the arbitration clause. Understandably, the trial judge had difficulty concealing his skepticism:

Well, then I say, "shame on them" for a corporation this big to take a document in a two hundred million dollar contract, having a clause that is right above the signature line, and say they didn't know it. I don't believe them. Now, if this was a credibility issue, if this was a credibility issue, and this was a case where I had to take the force of the evidence, I'd say that something is wrong with their testimony, or they just fell on their job. And what they're trying to do now is cover their own mistakes, because of the situation before the court; because it's very difficult for me to believe that a clause—it's not hidden. It's not like in the middle of the contract. It's there.

Tr. 2, at 40. In fact, the arbitration clause was a standard provision used in all Riley contracts since at least 1946. Mencow Dep. (cont.) at 61.

There is evidence to suggest that both REA and Cajun were aware of the arbitration clause. John Holt, the REA administrator in charge of the Cajun project, testified that his assistant project engineer, John Stephan, had been aware that the arbitration clause was in the contract. Holt Dep. at 61.

Apparently, Henry Tilles was the only Cajun agent who went through the whole of Contract G2–2 line by line. Tilles was a supervising mechanical engineer at Burns and Roe, Inc., consulting engineers for Cajun on the project. Tilles had responsibility for reviewing and evaluating Riley's steam generator bid; he worked under the supervision of Irving Chait, manager of the Cajun project at Burns and Roe. Tilles Dep. at 7–9; Chait Aff. Chait was responsible for compiling the final Contract G2–2 doc-

uments for signature by the parties. Chait Dep. at 70, 81–82. He was "very much" involved in the review of the proposals, Tilles Dep. at 8; after Tilles reported to him on the various proposals, Chait "would essentially go through them, he would review them, and he would—Chait would turn everything upside down, and so on and so forth." *Id.* at 9.

Tilles testified that he was well aware of the arbitration clause contained in Riley's proposal:

A. What is on page—well, I did see that—I did see that. That's what you want me to—I saw the note that the dispute would be solved by arbitration.

Did I see it? Of course.

Q. What was your reaction to seeing that?

A. I was very happy about it. Because I saw that this is a nice gesture. That was respect to everybody present. You know, they did not want to be involved, too. Legal work, and so forth. They want arbitration.

So, mentally, I gave them a pat on the shoulder.

*Id.* at 15–16. Both Tilles and Chait testified that anyone who read the contract would see the arbitration clause:

A. Well, the contract was—the arbitration clause is right in the contract, right before the signature of the president of Riley. So, how can you—how can you omit it? I mean, I can't understand. I don't understand the question. How—it's there. It was there from the very first minute, and nobody even thought about it. At all. I didn't, for sure. I told you, already, I was happy to see it, and that was it.... So, how can you—how can you say you didn't see it? You look for the signature, and so on, so you see it there.

Tilles Dep. at 34.

Q. I am asking you a question. Don't you agree that it's unlikely that someone looking at that page checking for the signature would not see the arbitration provision?

A. He would see it—

Q. Thank you.

MR. KRACHT: Let him finish the answer.

A. He would see it, but it doesn't mean that it would be meaningful, since he was only looking for the signature. Chait Dep. at 184.

"When the facts are against you, argue the law," it is said. But in this case Cajun has little to fall back on in the way of legal support.[2]

■ Under elementary principles of contract law, one is presumed to have read a contract that one signs:

A person who signs a written instrument is presumed to know its contents and cannot avoid its obligations by contending that he did not read it, or that it was not explained or that he did not understand it. *Carter's Insurance Agency, Inc. v. Franklin*, 428 So.2d 808 (La.App. 1st Cir.1983).

*Smith v. Leger*, 439 So.2d 1203, 1206 (La. Ct.App.1983).[3] Thus, except where there is evidence of fraud, misrepresentation, or de-

ceit, one who signs a written contract is bound by its terms:

In *Lester v. Walker*, 1911, 172 Ala. 104, 55 So. 619, the Alabama Supreme Court said:

"In the absence of misrepresentation, fraud, or deceit, the execution of an instrument by one who can read and write is binding upon him, even though he did not read it, or was ignorant of its contents. *Bank of Guntersville v. Webb & Butler*, 108 Ala. 132, 19 South. 14."

That is in accord with the generally prevailing law.

■ *Southeastern Enameling Corp. v. General Bronze Corp.*, 434 F.2d 330, 334 (5th Cir.1970).[4] This is true whether or not one of the parties to a contract is in fact unaware of one or more of the terms contained in it: " 'One who has executed a written contract in ignorance of its contents cannot set up his ignorance to avoid the obligation in the absence of fraud or misrepresentation.' " *Southeastern En-*

---

**2.** *See Mitsubishi Motors Corp. v. Soler Chrysler-Plymouth*, —— U.S. ——, 105 S.Ct. 3346, 3354, 87 L.Ed.2d 444 (1985):

[T]he first task of a court asked to compel arbitration of a dispute is to determine whether the parties agreed to arbitrate that dispute. The court is to make this determination by applying the "federal substantive law of arbitrability, applicable to any arbitration agreement within the coverage of the Act." *Moses H. Cone Memorial Hospital*, 460 U.S. [1], at 24, 103 S.Ct. [927], at 941 [74 L.Ed.2d 765]. *See Prima Paint Corp. v. Flood & Conklin Mfg. Corp.*, 388 U.S. 395, 400–404, 87 S.Ct. 1801, 1804–1806, 18 L.Ed.2d 1270 (1967); *Southland Corp. v. Keating*, 465 U.S. 1, 11–13, 104 S.Ct. 852, 859–860, 79 L.Ed.2d 1 (1984). And that body of law counsels

that questions of arbitrability must be addressed with a healthy regard for the federal policy favoring arbitration.... The Arbitration Act establishes that, as a matter of federal law, any doubts concerning the scope of arbitrable issues should be resolved in favor of arbitration, whether the problem at hand is the construction of the contract language itself or an allegation of waiver, delay, or a like defense to arbitrability." *Moses H. Cone Memorial Hospital, supra*, 460 U.S., at 24–25, 103 S.Ct., at 941–942.

In this case, the parties have stipulated that Louisiana law will govern in matters of contract

construction and interpretation. *See* Contract G2–2, at GC–4. It appears in any event that Cajun's claims must necessarily fail, whether state or federal law be applied.

**3.** *Cf. N & D Fashions, Inc. v. DHJ Industries, Inc.*, 548 F.2d 722, 727 (8th Cir.1976) ("one who executes a contract cannot avoid it on the ground that he did not read it or supposed it to be different in its terms"); 17 C.J.S. Contracts § 137 (1963); *see also Upton v. Tribilcock*, 91 U.S. 45, 50, 1 Otto 45, 50, 23 L.Ed. 203 (1875):

It will not do for a man to enter into a contract and, when called upon to respond to it obligations, to say that he did not read it when he signed it, or did not know what it contained. If this were permitted, contracts would not be worth the paper on which they are written. But such is not the law. A contractor must stand by the words of his contract; and, if he will not read what he signs, he alone is responsible for his omission.

**4.** *Cf. Rudy v. Eagle Indemnity Co.*, 178 F.2d 94, 96 (5th Cir.1949); *Hicks v. Ocean Drilling & Exploration Co.*, 512 F.2d 817, 825–26 (5th Cir. 1975), *cert. denied sub nom. H.B. Buster Hughes, Inc. v. Ocean Drilling & Exploration Co.*, 423 U.S. 1050, 96 S.Ct. 777, 46 L.Ed.2d 639 (1976); *cf.* 17 Am.Jur.2d Contracts § 149; 3 Corbin on Contracts § 607; 1 Williston on Contracts § 95A (3d ed.).

*ameling,* 434 F.2d at 334. Evidence as to the intentions of the parties making a contract is relevant only if the contract is ambiguous or internally inconsistent on its face; otherwise, interpretation of a contract remains within the "four corners" of the written document:

"When the intent of the parties is evident and lawful, neither equity nor usage can be resorted to, in order to enlarge or restrain that intent...." Louisiana Civil Code art. 1963 (1870). The intent of [the parties], if any, is to be determined only from the words of their contract if that contract on its face is clear, explicit, and leads to no absurd consequences. Louisiana Civil Code art. 1945(3) (1870), *recodified as* art. 2046 (1985).

*Chevron U.S.A., Inc. v. Belco Petroleum Corp.,* 755 F.2d 1151, 1153 (5th Cir.1985) (footnote omitted); *see also id.* at 1154 ("Under Louisiana's four-corners rule, as stated in Civil Code article 2046, the fact that both parties signed an explicit, unambiguous contract is conclusive evidence of their mutual intent.").[5] As the Eighth Circuit has nicely expressed it, "our function in construing this contract is to determine the parties' intent from what they said and not from what they meant to say." *Johnson Controls, Inc. v. City of Cedar Rapids, Iowa,* 713 F.2d 370, 375 (8th Cir.1983).[6]

The foregoing principles of contract interpretation have been applied by courts in the precise context at issue here. In *T & R Enterprises v. Continental Grain Co.,* 613 F.2d 1272 (5th Cir.1980), this court decided that an arbitration clause had to be honored even when it was printed on the back of a sales confirmation slip that T & R's president signed and returned to Continental. The court firmly rejected T & R's complaint that the arbitration clause had not been mentioned in telephone conversations between the parties, finding that

these allegations did not even put the existence of an arbitration agreement "in issue":

Here, T & R has not made a sufficient showing to entitle it to a trial by jury on demand. The contracts underlying this litigation and containing the arbitration clauses were not only signed and returned by T & R but they were asserted in the original complaint filed by T & R to be the contracts between the parties. The only item in the record approaching "an unequivocal denial that the agreement to arbitrate was made" is T & R's assertion that it believed the telephone conversations with Continental's agent constituted the real contracts and that the subsequently exchanged signed confirmation slips cannot modify or add essential terms. This argument is contrary to the universally prevailing rule that, absent allegations of misrepresentation, fraud, or deceit, one who executes a written contract is bound by its terms.

*Id.* at 1278. Similarly, in *Coastal Industries v. Automatic Steam Products,* 654 F.2d 375, 379 n. 8 (1981), this court noted that "Arbitration can be enforced against a party who signs a document with or without actual awareness of the arbitration provision therein." In *Bigge Crane and Rigging Co. v. Docutel Corporation,* 371 F.Supp. 240 (E.D.N.Y.1973) the court likewise faced a contention that an arbitration clause had been "buried" in a contract and that there had been no meeting of minds on the clause. In the absence of fraud or duress, concluded the court, "The focus of this court is not on whether there was subjective agreement to all clauses in the underlying contract but whether there was agreement to the contract embodying the clause in question." *Id.* at 243.

In the present case, it is undisputed that a representative of Riley signed the con-

**5.** *Cf. Leger,* 439 So.2d at 1206:

Courts are bound to give legal effect to all written contracts according to the true intent of the parties and this intent is to be determined by the words of the contract when these are clear, explicit and lead to no absurd consequences. La.C.C. art. 1945; *Leenerts Farms, Inc. v. Rogers,* 421 So.2d 216 (La.1982).

**6.** *Cf. Commercial Metals Co. v. United States,* 176 Ct.Cl. 343, 349–53 (1966) (per curiam) (a party's historical practice and subjective intent, which have not been incorporated into the written contract, cannot be used to modify the language actually used in the written contract).

tract; Cajun's President signed it; Cajun's Board of Directors ratified it; and the REA approved it. Cajun has not pleaded fraud, misrepresentation, deceit, duress, or coercion. The first sentence of the contract states: "The following lists all the pages which constitute the contract." One of the pages listed is page 29 of Riley Proposal 53020, which contains the arbitration clause, under a heading clearly labeled "ARBITRATION." The arbitration clause is not ambiguous:

> Any controversy or claim arising out of or relating to this contract, or the breach thereof, shall be settled by arbitration, in accordance with the Rules of the American Arbitration Association, and judgement [*sic*] upon the award rendered by the arbitrators may be entered in any Court having jurisdiction thereof.

The subject of arbitration is not mentioned anywhere else in the contract.

■ From the foregoing, then, it appears that no material issues of fact are in dispute in this case,[7] and that the trial court was correct in holding that the arbitration clause had to be given effect.

### III. THE DEVIATIONS CLAUSE

■ Cajun's main (or at least its best) argument on appeal seems to be that the contract is ambiguous or internally inconsistent on its face.[8] This is so, Cajun argues, because the contract contains the following "deviations clause":

> Any deviations from the requirements of the Contract Documents shall be specifically indicated and listed separately. Failure to indicate such deviations will mean that the Contractor has accepted the specification requirements.

Contract G2–2, at 10a. Cajun maintains that the arbitration clause is a deviation from its specifications. Thus, since Riley did not include arbitration in the list of "Clarifications of, and Exceptions to, the Specifications" that it added to the contract, *see* Contract G2–2, at 15(O)–15(V), Cajun argues that the arbitration clause is null and void and that Cajun's terms prevail, i.e., no arbitration.

The use of deviations and exceptions clauses is apparently quite common in the construction industry. The rationale is clear: With lengthy contracts of the sort at issue here, one needs a handy means of assessing how and where terms proposed by bidders differ from those originally contemplated by the owner. It is impractical to page through a lengthy, technical document to compare original specifications and bidder's proposals term for term. If the bidder is proposing different terms or specifications, the owner must be alerted in systematic fashion to that fact.

It is inherent in the logic of these things that a deviation is always a "deviation *from*" something and an exception is always an "exception *to*" something.[9] Counsel for Cajun explained this quite well at oral argument:

> Now, looking at the deviations clause, Judge, you will find that it refers to any deviation, and, of course, deviation means stray from the standard or to turn aside from the requirements of the contract documents.

Transcript of Proceedings (July 20, 1984) ("Tr. 1"), at 22.[10]

Thus, for example, if Cajun had specified that its boilers should weigh 20 tons, and

---

**7.** *Cf.* Appellant's Brief at 20:
Cajun submits that the issue is ripe for decision by the Court of Appeals and a finding that, as a matter of law, the four corners of the contract will not admit of an interpretation which gives *any* effect to the arbitration clause contained on that signature page of Riley's form Proposal No. 53020.
*See also id.* at 48.

**8.** *See* Appellant's Brief at 25, 41; Petition for Writ of Mandamus, Petitioner's Reply Memorandum at 2–3.

**9.** *See Oxford English Dictionary* 708 (Compact ed. 1971) ("deviation" as "Divergence *from* any course, method, rule, standard, etc.") (emphasis in original); *cf. id.* at 916 (defining "exception").

**10.** *Cf.* Holt Dep. at 16:
Q. What do you mean by exception?
A. Something that conflicts with *what we have asked for* in the specification.
(emphasis added).

Riley had proposed to install 10 ton boilers, then there would be a clear "deviation from" or "exception to" the contract specifications. The deviations clause regulates this situation as follows: Where there is a conflict or inconsistency in terms, Cajun's terms prevail, unless the bidder has listed its conflicting term as a "deviation or exception." (Then, presumably, Cajun has clear notice of any deviant terms before it has to decide whether to accept them or not.) The above example can be represented as follows:

### Deviations Clause

| Cajun's Specifications | Riley's Proposal |
|---|---|
| 20-ton boilers | 10-ton boilers |

As Cajun notes in its Reply Brief, at 8–10, the deviations clause functions as a "master key" or second-order clause. It determines the legal effect of other terms in the contract.

The situation presented by the facts of the present case can be represented as follows:

### Deviations Clause

| Cajun's Specifications | Riley's Proposal |
|---|---|
| | Arbitration |

Arbitration is not mentioned in Cajun's specifications or contract requirements at all.[11] Except for the arbitration clause in Riley's proposal, the contract is completely and utterly silent on the subject. The deviations clause says: Any deviations from "the requirements of the Contract Documents" shall be specifically indicated and listed separately; otherwise, "the specification requirements" will prevail. There are no "requirements" or "specifications" in the contract documents *from which* the arbitration clause could be a "deviation" or *to which* it could be an "exception."[12]

In fact, the contract, with Riley's arbitration clause incorporated, is perfectly consistent and unambiguous on its face. It says that claims or disputes arising under the contract shall be arbitrated. Nothing else in the contract contradicts or conflicts with this in any way.[13]

**11.** *See* Appellant's Brief at 8 ("The Bid Documents furnished to Riley made no reference to arbitration."); *see also* Tilles Dep. at 18:

Q. Were you familiar enough with the Burns & Roe specifications, to know whether or not the arbitration clause deviated from them?

A. First of all, nowhere in Burns & Roe specifications is there an arbitration clause called for.

Did you find one somewhere?

Q. No.

*Cf. id.* at 20:

Q. As far as you were concerned, as the person evaluating the bids and primarily responsible for the specifications, was there a dispute resolution clause provided in the specifications?

A. No.

Q. All right.

A. If you find one, I will be very interested to see it.

**12.** *See* Tilles Dep. at 17:

Q. Did you think the arbitration clause deviated from any portion of the specifications?

A. No.

*See also id.* at 69:

' Q. And it was not significant to you, at the time, that Riley did not list arbitration in the clarifications or exceptions?

A. No. We did not call for it in the specification.

Q. All right.

A. All right? We did not call for any arbitration, or any—did not call—we called for all kinds of things.

Q. All right.

A. For workmen's compensation, for overtime payments. We called up all kinds of things in the specification. But we did not call for any arbitration or not arbitration.

*Cf. id.* at 80:

I can—I can add to it, the thing which we already spoke before; that the specifications—the specification to which Riley answered by their proposal, did not call for any arbitration or any—or call—proposals and the specifications did not call for it. That's why they did not have—there was no reason to put it on the list of clarifications and specifications, clarifications and so on.

**13.** In effect, Cajun argues that the contract as written conflicts with or is inconsistent with a contract having no arbitration clause:

Now, Mr. Hedlund's suggestion to you is that there was nothing in the contract that we had proffered to them, that is, Cajun proffered to the bidders, to deviate to with respect to arbitration. It's true, I admit to you, that there was no provision therein saying you

Even if the above considerations did not apply, there are further indications that Cajun's arguments do not hold water, or steam, as the case may be. The deviations clause does not state where or how deviations from the contract specifications are to be "specifically indicated and listed separately." Thus, it is not at all clear that Riley has not complied with these requirements simply by listing page 29, separately, both in the general index to the contract and in the index to Riley Proposal 53020.[14] If this suggestion seems contrary to the pragmatic rationale of a deviations scheme, we point to a much more extreme interpretation advanced by Cajun:

> The Deviation Clause requires the interpreter to do something that is not typically required in construing a contract. The Deviations Clause places each and every term in Riley's Proposal No. 53020 in a separate class of potential terms of the agreement. Before any given term contained in Riley's form of Proposal No. 53020 may be given legal effect, it must meet the individual test of responsiveness to the "specification requirements," both in express and implied requirements.... *The contract is thus unique*

*in that it specifically requires the court to engage in line item consideration of each and every term in Riley's proposal.*

Reply Brief at 9–10 (emphasis added). On this theory, *everything* in Riley's Proposal 53020 would be a potential "deviation," which would of course defeat the whole purpose of a deviations scheme. But even under Cajun's interpretation the whole of Riley Proposal 53020—including the arbitration clause—could be viewed as a "deviation" accepted in direct negotiation:

> A. [T]his was a negotiated contract which allowed the negotiating committee to accept certain exceptions and clarifications, and still be approved by REA....
>
> Q. Did the informal procedure also allow the owner to accept deviations from the contract specifications?
>
> A. The informal bidding does not, but this was later negotiated. Under an informal bidding there can be no exceptions made.
>
> Q. But in this case Cajun asked for, and received, permission to direct negotiations?

---

cannot arbitrate; the document was signed as to arbitration. And if I understand arbitration right, we talk about a right to arbitrate. And all of the cases I know of say that that right arises only by virtue of a contract. The only way you can have arbitration is by a contract. If it's silent as to arbitration, you don't have the right to arbitrate.

If, on the other hand, there is a provision within the contract that says that you must arbitrate, then you have the right to arbitrate. The silence is well known to be a denial of the right of arbitration and when compared with inserting a provision trying to create that right, you see the deviation.

Transcript of Proceedings (Jan. 6, 1986) ("Tr. 3"), at 32–33. In other words, the contract originally envisioned by Cajun contained no written arbitration clause. Thus, if we had *that* contract before us, we could not enforce arbitration. Since the arbitration clause that is actually in the contract does allow for the enforcement of arbitration, something different from what Cajun envisioned will happen if that clause is valid. Therefore, the clause is a "deviation" or exception.

As noted previously, however, the deviations clause says that any deviations from *"the requirements"* of the contract documents shall be

specifically indicated and listed separately, and that otherwise *"the specification requirements"* will prevail. The deviations clause does *not* "require ... that any and all deviations from *the contract documents* be specifically indicated and separately listed," Appellant's Brief at 15 (emphasis added), nor does it "require ... bidder to 'specifically indicate and list separately' *changes, additions* or deviations they wished to propose for inclusion in the contract," *id.* at 48 (emphasis added).

Alternatively, Cajun tries to construe this as an "offer-and-acceptance" situation involving "nonconforming" terms, which is inapplicable since, among other things, both parties signed the same final contract, thereby ending any "battle of the forms" that might have been brewing.

**14.** *Cf.* Holt Dep. at 20:

> Q. What is the proper method for specifically indicating and separately listing deviations?
>
> THE WITNESS: The method used would be the one that has been prepared by the engineers with their borrower. REA does not specify how they must do it, they would put in the clause, we would review it.

A. That is correct.

Q. Under the direct negotiations procedure could the owner accept deviations, whether or not listed in the exceptions and clarifications?

A. Under the negotiated procedure the owner can accept exceptions.

Q. Whether—regardless of whether the exceptions and clarification section is part of the original document, is that correct?

A. That's correct.

Holt Dep. at 66–67.

Furthermore, it appears that even if Riley had specifically proposed arbitration as a "deviation or exception," Cajun would have agreed to it. Tilles testified that the other bidders had listed arbitration as "deviations or exceptions" to Cajun's specification requirements, and that Chait had not objected:

BY MR. GUMBINER:

Q. Did Mr. Bodenhamer ask you about the Babcock and Wilcox or Combustion proposal, yesterday?

A. No. But he showed me a page or two from each.

Q. The best of them, huh?

A. Well, the pages were—they were—they were proposed arbitration.

Q. You saw the page of Combustion Engineering, called arbitration clause and clarification, is that right?

A. Yes.

Q. When that clarification was shown to Mr. Chait, did he object, at all, that you can recall—

A. No.

Q. —about an arbitration clause?

A. Nobody would object. As I told you, nobody would object to arbitration. I mean, we felt that this is a nice attitude. It was my feeling. I'm sure it was also Chait's feeling. And we didn't talk about it, naturally.

Q. Would your answer be the same, regarding the arbitration clause submitted by Babcock and Wilcox?

A. Yes. They are all the same language, the same way written, and the same—same language as in writing.

Tilles Dep. at 75–76. Tilles therefore concluded that the arbitration clause would have made its way into the final contract even if Riley had specifically listed it as a "deviation or exception":

Q. Through the course of all your discussions with Mr. Chait, regarding the proposals of Riley Stoker, Babcock and Wilcox, and Combustion Engineering, Mr. Chait never once told you that arbitration was unacceptable?

[Objection]

THE WITNESS: We did not discuss it. I don't think that—I can bet my—my second bottom dollar, that he wouldn't object, even today.

. . . .

Q. (By Mr. Gumbiner) Through the course of reviewing the clarifications and exceptions of Babcock and Wilcox, or Combustion Engineering, can you recall anybody, at any time, with Burns & Roe, or Cajun, raising a question about their arbitration clauses?

A. No. And I can tell you that all three clauses and all three proposals, you know, are exactly the same verbiage. The same language. Exactly. Arbitration, you know?

. . . .

Q. Do you have any reason to believe, today, that had Riley Stoker listed that arbitration clause in the clarifications and exceptions, that it would not have become part of the contract?

[Objections]

THE WITNESS: No.

*Id.* at 76–79.

Thus, even after passing in review all of Cajun's arguments, we return to the conclusion that the arbitration clause must be given effect.

## IV. THE MANDAMUS PROCEEDING

In addition to its direct appeal, Cajun has filed a Petition for Writ of Mandamus as what it terms "the appropriate and expedi-

ent means of protecting petitioner's right" to a jury trial. Riley responds that the mandamus action is frivolous; that mandamus is in any event barred because of the availability of direct appeal; and that the court should award Riley its attorney's fees incurred in defending the mandamus action. We agree with Riley.

A writ of mandamus is an extraordinary remedy available only where there is a clear and indisputable abuse of discretion or usurpation of judicial power by the trial court. *Allied Chemical Corp. v. Daiflon, Inc.*, 449 U.S. 33, 34–36, 101 S.Ct. 188, 189–90, 66 L.Ed.2d 193 (1980); *Schlagenhauf v. Holder*, 379 U.S. 104, 109–10, 85 S.Ct. 234, 238, 13 L.Ed.2d 152 (1964); *In re Sessions*, 672 F.2d 564, 566 (5th Cir. 1982). There is nothing in the record to suggest that the trial court's handling of this case was anything but exemplary. At worst, the trial court seems to have changed its mind, on the basis of a more fully developed record, as to whether an evidentiary hearing was required on the issue of the existence of an arbitration agreement:

On January 24, 1985, the Court issued a minute entry which set an evidentiary hearing on the issue of whether the parties agreed to include an arbitration clause in a contract that was entered into in 1975, approximately eight years before this suit was filed. The Court allowed the parties to conduct discovery on the arbitration issue. Thereafter, the Court, being undecided on whether an evidentiary hearing was in fact required herein, allowed the parties to reargue the matter. After considering the additional briefs, together with the attachments

thereto, and the arguments presented by the parties, the Court concluded that the contract clearly contains an arbitration clause which requires the parties to arbitrate the issues in dispute in this case. Opinion, at 1–2 (footnotes omitted).[15] A court may reconsider its own rulings to avoid perpetuating error. To hold otherwise would be to elevate consistency over justice. *Wm. G. Roe & Co. v. Armour Co.*, 414 F.2d 862, 867–68 (5th Cir.1969); *United States v. Horton*, 622 F.2d 144, 148 (5th Cir.1980). *Cf. Piambino v. Bailey*, 757 F.2d 1112, 1120 (11th Cir.1985); *Major v. Benton*, 647 F.2d 110, 112 (10th Cir.1981).

Cajun also runs afoul of the well established rule that mandamus is barred where direct appeal is available. "It is, of course, well settled, that the writ [of mandamus] is not to be used as a substitute for appeal." *Schlagenhauf*, 379 U.S. at 110, 85 S.Ct. at 234, 13 L.Ed.2d 152; *see also Moses H. Cone Memorial Hospital v. Mercury Construction Corp.*, 460 U.S. 1, 8 n. 6, 103 S.Ct. 927, 933 n. 6, 74 L.Ed.2d 765 (1983):

[A] court of appeals has no occasion to engage in extraordinary review by mandamus "in aid of [its] jurisdictio[n]," 28 USC § 1651 [28 USCS § 1651], when it can exercise the same review by a contemporaneous ordinary appeal. *See, e.g., Hines v. D'Artois*, 531 F.2d 726, 732, and n. 10 (CA5 1976).

*Cf. Helstoski v. Meanor*, 442 U.S. 500, 99 S.Ct. 2445, 61 L.Ed.2d 30 (1979); *United States v. Denson*, 603 F.2d 1143, 1147 & n. 2 (5th Cir.1979). It is indisputable that review by interlocutory appeal under 28 U.S.C. § 1292(a)(1) is available in this case. *Coastal Industries, Inc. v. Automatic Steam Products Corp.*, 654 F.2d 375, 377

**15.** *Cf.* Tr. 2, at 38–39:

THE COURT: When we first had the first oral argument and I wrote this minute entry and what-have-you, I didn't have the whole picture in front of me of how the contract was negotiated and what-have-you; but I have a picture now. It wasn't an all-of-a sudden thing. It wasn't something being hidden from somebody. It wasn't overreaching on the part of one party over the other.

What you have here is eight months of people having the various clauses and ex-

changes and what-have-you of the various provisions in the agreement with them; but more important what you have is this, even assuming you needed something in a deviation clause, even assuming that, you have your people compiling a list of the provisions that should go in there; and there's no question, no question that your people knew that the arbitration clause was in there. There is not a single bit of evidence in this record that would say that Cajun did not know ... that the arbitration clause was in there.

n. 1 (5th Cir.1981); *Commerce Park at DFW Freeport v. Mardian Construction Co.*, 729 F.2d 334, 337 (5th Cir.1984).

■ On the basis of the foregoing considerations we conclude that the mandamus proceeding is inappropriate and essentially frivolous and that Riley should be able to recover its attorney's fees incurred in defending the mandamus action under Fed.R. App.P. 38 and 28 U.S.C. § 1927. *See In re Oximetrix, Inc.*, 748 F.2d 637, 644 (Fed.Cir. 1984); *Texas v. Gulf Water Benefaction Co.*, 679 F.2d 85, 87 (5th Cir.1982); *Stelly v. Commissioner of Internal Revenue*, 761 F.2d 1113, 1116 (5th Cir.1985); *Hagerty v. Clement*, 749 F.2d 217, 222 (5th Cir.1984); *Knoblauch v. Commissioner of Internal Revenue*, 749 F.2d 200, 202 (5th Cir.1984).

## V. CONCLUSION

The arbitration clause is a very vital and integral part of this contract, as it is of many contracts in the commercial operations of our society. Saying that the arbitration clause was not a part of this contract is like watching a performance of *Hamlet* in which Hamlet himself never appears. Seeing this arbitration clause did not require twenty-twenty vision. It was not an optical illusion. It was there from the moment it was first inserted; it was there when it was signed; and it was there when it was delivered. To say otherwise would require the magic of a Houdini to erase the obvious, the realistic, the touchable words and the attitudinal conduct of the parties thereto. It is strange indeed that an important element of a commercial transaction and negotiation such as arbitration would not be involved in any way in the discussion between the parties, while at the same time it occupied a major role in the documentation of an agreement freely entered into without fraud, deceit, or misrepresentation. The contract with its arbitration command stands.

We AFFIRM the district court's decision to stay proceedings in this case pending arbitration. Cajun's Petition for Writ of Mandamus is DENIED.

We also assess against Cajun and its counsel the attorney's fees incurred by Riley in responding to the Petition for Mandamus in this court, in the amount of $8,515.00. Riley has adequately documented these expenses incurred up to the time of the filing of its appeal brief. *See* Local Rule 47.8.1.