**ESTATE of Arthur Dwight HAAS, Deceased, Plaintiff-Appellant,**

v.

**METRO–GOLDWYN–MAYER, INC., Defendant-Appellee.**

No. 78–1321.

United States Court of Appeals, Fifth Circuit.

May 29, 1980.

Jenkens & Gilchrist, William D. Sims, Jr., Dallas, Tex., for plaintiff-appellant.

Stroud & Smith, Dan McElroy, Dallas, Tex., Jeffrey L. Levine, Los Angeles, Cal., for defendant-appellee.

Before TUTTLE, FAY and THOMAS A. CLARK, Circuit Judges.

THOMAS A. CLARK, Circuit Judge:

We are asked to decide whether the Estate of Arthur Dwight Haas (hereinafter the "Haas Estate") is entitled to recover from Metro-Goldwyn-Mayer, Inc. (hereinafter "MGM") $20,665.84 which the appellant contends MGM improperly paid directly to Mr. Lewis Jeffrey Selznick, son of the late movie producer David O. Selznick. The district court granted MGM's motion for summary judgment on the ground that Mr. Haas had not properly notified MGM of the assignment under § 9–318(3) of the Uniform Commercial Code. We affirm.

As most filmgoers certainly know, David O. Selznick's greatest film triumph was the 1939 movie *Gone With the Wind*. In an effort to resolve certain disputes between David Selznick's company, The Selznick Company, Inc., and MGM concerning the radio and television rights to the novel *Gone With the Wind*, they agreed in 1963 that The Selznick Company would become entitled to a royalty payment of $200,000 by MGM upon the first television broadcast in this country of the movie *Gone With the Wind*. The agreement also provided that should the movie first be telecast outside the United States, $50,000 of the $200,000 would be payable immediately with the re-

maining $150,000 payable upon the first United States telecast. The Selznick Company was liquidated shortly after David Selznick's death in 1965. The Selznick Company's rights under the 1963 Agreement ultimately passed to David Selznick's various legatees, including his son, Lewis Jeffrey Selznick. Thus, upon the first telecast of *Gone With the Wind*, Lewis J. Selznick would become entitled to a share of the $200,000 royalty payment from MGM. His share constituted 23% of 59.901% of the $200,000, or $27,554.46.

In early 1975, Mr. A. D. Haas agreed to assist Lewis Jeffrey Selznick ("Selznick") in several business ventures, including a Dallas, Texas, retail clothing store. As part of this arrangement, Haas loaned Selznick several hundred thousand dollars. To secure the loans Selznick granted Haas a security interest in his right to payment of his share of the television royalties from the first television broadcast of *Gone With the Wind*. However, at that time both parties had no way of knowing exactly when or where the movie would be shown first on television.

The security agreement, executed on June 23, 1975, specified that Lewis J. Selznick "GRANTS AND ASSIGNS" to Haas, "a security interest in the following described property . . .":

> All of Debtor's [Selznick's] rights in and under the MGM Agreement . . . including without limitation, the right to receive income or profits, whether such rights are now owned or hereafter acquired and whether such income or profits are distributed in cash or property, and any and all proceeds or accounts, arising from or by virtue of the sale or other disposition of, or from any insurance payable with respect to or from the collection of, the Collateral.

In addition, Selznick and Haas jointly notified MGM's legal department of Haas' security agreement by the following letter:

June 23, 1975

Metro-Goldwyn-Mayer, Inc.
10202 West Washington Blvd.
Culver City, California 90230

Attention: General Counsel

Re: Telecast of
"Gone With The Wind"

Gentlemen:

Metro-Goldwyn-Mayer, Inc. ("MGM") has entered into a certain agreement (the "Agreement"), dated December 13, 1963, with The Selznick Company, Inc. (the "Company") under which the Company will be entitled to a payment from MGM of $200,000.00 upon the first television broadcast in the United States of the photoplay "Gone With The Wind" (the "Film"), with $50,000.00 of such $200,-000.00 due to the Company upon the first foreign telecast of the Film if such telecast takes place prior to the first telecast in the United States. Pursuant to the Agreement, the Company also owns a 50% interest in the net profits of MGM from the exploitation of certain radio and television rights related to the Film.

All rights of the Company under the Agreement have now passed to the legatees, including L. Jeffrey Selznick, of David O. Selznick, Deceased. L. Jeffrey Selznick has granted to A. D. Haas a security interest in all of the rights of L. Jeffrey Selznick under the Agreement. We, therefore, request that MGM do the following:

(1) Notify Mr. Haas, in advance, of any payments to be made under the Agreement and disburse the portion due to Mr. Selznick as Mr. Haas and Mr. Selznick shall jointly direct.

(2) Notify Mr. Haas of any event which materially affects the rights of Mr. Selznick under the Agreement, including any arrangement by MGM for exploitation of radio or television rights related to the Film.

(3) Acknowledge receipt of this notification by executing the enclosed copy in the space provided and returning it to A. D. Haas at the address indicated below.

Sincerely,

/s/ L. Jeffrey Selznick

L. Jeffrey Selznick
P. O. Box 800
Montego Freeport Shopping Centre
Montego Bay 2, Jamaica W. I.

/s/ A. D. Haas

A. D. Haas
2015 One Main Place
Dallas, Texas 75250

Received and Acknowledged this __ day of June, 1975.

METRO–GOLDWYN–MAYER INC.

By: _____

Haas also filed a financing statement with the Commercial Code Division of the California Secretary of State's office in Sacramento.

In response to the Selznick and Haas June 23 joint letter, MGM wrote Haas on July 10, 1975, that, "[w]hat you are asking MGM to do is to assume contractual obligations in addition to those set forth in the December 13, 1963 Agreement, and we regret to advise that we are not willing to do so." Furthermore, since in the past MGM had only dealt with a Santa Monica attorney named Barry Brannen concerning the administration of the 1963 royalty agreement, MGM advised Haas that it would only accept payment instructions from Mr. Brannen and that, "we [MGM] plan to forward Mr. Lewis Jeffrey Selznick's share of such payments when and as due to Mr. Brannen for distribution."

Neither Haas nor Selznick made any attempt either to respond to MGM's blunt refusal to comply with the June 23 request for prepayment notification or to contact Mr. Brannen to pursue the matter of the attempted assignment.

Subsequently, although the sequence of events is not entirely clear from the record, Mr. Haas died, Mr. Selznick defaulted in his obligations to Mr. Haas and/or the Haas Estate, and the Haas Estate filed suit against Mr. Selznick in Texas state court and obtained a judgment of $222,896.00

Sometime prior to the entry of the Texas judgment, *Gone With the Wind* was first telecast overseas. Pursuant to the terms of the 1963 Agreement, Lewis Selznick became entitled to payment of his share of $50,000 in royalties, or $6,888.62. Consistent with its prior refusal, MGM made no attempt to comply with the Haas and Selznick joint

letter before drawing a check dated October 6, 1975, payable to Selznick, and forwarding the same to Mr. Brannen on October 9, 1975. The check was then transmitted to Selznick who ultimately endorsed the check over to the Haas Estate. There is no evidence in the record to indicate that either Selznick or the Haas Estate protested MGM's or Mr. Brannen's handling of this first royalty payment.

*Gone With the Wind* was first telecast in this country in June, 1976. At that time MGM paid the remaining $150,000 to David Selznick's legatees, including $20,665.84 to Lewis Jeffrey Selznick. This time, however, MGM sent its check directly to Selznick at his home in Jamaica. Instead of endorsing the check over to the Haas Estate, Selznick deposited the check in his bank account and did not apply those funds to his indebtedness to the Haas Estate.

Thereafter, apparently unable to obtain the cooperation of Mr. Selznick, the Haas Estate wrote MGM on November 3, 1976, advising the company that Selznick had defaulted in his obligations to the Estate. The Haas Estate requested that all payments due Selznick be made directly to it. MGM responded on November 10 that all payments by MGM due to Selznick under the 1963 Agreement had already been made. Upon MGM's refusal to accede to the demand of the Haas Estate that MGM pay the Estate the $20,665.84 which had already been paid directly to Selznick, this action followed.

▮ The single issue presented by this appeal is whether the *Gone With the Wind* royalty payments were effectively assigned by Selznick to the Haas Estate under the guidelines contained in Uniform Commercial Code § 9–318(3).[1] If there was an effective assignment by Selznick (the "assignor") to Haas (the "assignee"), then MGM (the "account debtor") was not autho-

rized to pay the royalty payments directly to Selznick. Without such authorization, and there was none here, the account debtor can be held liable to the assignee for the amount of the assigned payment, here $20,-665.84. Thus, if an account debtor fails to follow the dictates of a valid assignment and improperly pays the assignor, the account debtor must answer to the assignee with a "double payment" in the amount of the improper payment.

UCC § 9318(3) provides:

The account debtor is authorized to pay the assignor until the account debtor receives notification that the amount due or to become due has been assigned and that payment is to made made to the assignee. A notification which does not reasonably identify the rights assigned is ineffective. If requested by the account debtor, the assignee must seasonably furnish reasonable proof that the assignment has been made and unless he does so the account debtor may pay the assignor.[2]

Thus, in order for there to be an effective assignment under § 9–318(3), the account debtor must be notified of two things. First, he must receive notice that the "amount due or to become due has been assigned." Second, the account debtor must also be notified that "payment is to be made to the assignee." *See, First National Bank of Rio Arriba v. Mountain States Telephone and Telegraph Co.*, 91 N.M. 126, 571 P.2d 118 (1977); *First National Bank at East St. Louis v. Board of Education, District No. 189*, 68 Ill.App.3d 21, 24 Ill.Dec. 670, 385 N.E.2d 811 (1979).

Here, although the parties arguably met the first requirement of § 9–318(3) in that the June 23, 1975, letter from Selznick and Haas to MGM did advise the latter that, "L. Jeffrey Selznick has granted to A. D. Haas a security interest in all of the rights of L. Jeffrey Selznick under the Agreement," it

---

1. *Cal.Com.Code* § 9318(3).

2. *Cal.Com.Code* § 9318(3) was amended in 1974, effective Jan. 1, 1976, as part of the adoption of the proposed 1972 Amendments to Article 9 of the UCC. The words in the first sentence of § 9318(3) "amount due or to be-

come due" replaced the word "account." Since this minor change in the statute does not affect the case *sub judice* in any way, it is of no matter which version of § 9318(3) is applicable to the assignment at issue here.

is not necessary to decide that issue since we find that the second requirement of § 9–318(3) was not met under the peculiar facts of this case.

■ Instead of notifying MGM that payment of the film royalties was to be made · directly to Haas as assignee, Selznick and Haas included in their June 23 letter a request that MGM should "[n]otify Mr. Haas, in advance, of any payments to be made under the Agreement and disburse the portion due to Mr. Selznick as Mr. Haas and Mr. Selznick shall jointly direct." Clearly, this is not a demand certain that MGM, as account debtor, pay Selznick's share of the *Gone With the Wind* television royalties directly to Haas. Here, Selznick and Haas, as assignor and assignee, respectively, requested MGM as account debtor to notify only the assignee when payment on the account became due and then await the joint payment instructions from the assignor and assignee.

On oral argument appellant urged strenuously that due to, (1) the uncertainty at the time of the June 23 letter and security agreement as to when and where *Gone With the Wind* would first be telecast, and (2) the additional uncertainty whether Haas would need to rely on his security interest for partial satisfaction of Selznick's indebtedness, the prepayment notification request was the only reasonable demand to make of MGM. Thus, because of the conditional nature of the "assignment," a § 9–318(3) notice to MGM to make payment directly to Haas was inappropriate.

We recognize that the purpose of Article 9 of the Uniform Commercial Code "is to provide a simple and unified structure within which the immense variety of present-day secured financing transactions can go forward with less cost and with greater certainty." [3] We are also aware of the uncertainty of Selznick and Haas with respect to the payment of the royalties. However, in light of events subsequent to the June 23, 1975, letter, we find that the assignment, even if initially valid under § 9–318(3), lacked continued vitality after those events.

■ Official Comment 3 to § 9–318 of the Uniform Commercial Code provides:

So long as the assignee permits the assignor to collect claims . . ., the account debtor may pay the assignor even though he may know of the assignment. In such a situation an assignee who wants to take over collections must notify the account debtor to make further payments to him.

Thus, even though an account debtor is aware that a valid assignment has been made, if the account debtor continues to pay the assignor and the assignee does not object, the account debtor is not bound by the assignment. *See, Ertel v. Radio Corporation of America*, 261 Ind. 573, 575, 307 N.E.2d 471, 473 (1974).

MGM responded promptly to the joint June 23 notification letter that it refused to comply with the request to notify Mr. Haas of any impending royalty payment. At no time before the two payments were made did either Mr. Haas, the Haas Estate, or Mr. Selznick respond to MGM's July 10, 1975, refusal to assent to the request in the initial attempted assignment. Furthermore, both Selznick and the Haas Estate acquiesced in MGM's refusal to comply with the June 23 request when the first royalty payment was made in October, 1975, directly to Selznick. Although this check for $6,888.62 was ultimately endorsed to the Haas Estate, it was on notice that MGM was not complying and, indeed, had not complied with the notification scheme proposed by Selznick and Haas. Alerted to the possibility that the second royalty payment would be paid directly to Selznick upon the first domestic telecast of *Gone With the Wind*, the Haas Estate did nothing. No attempt was made by either Selznick or the Haas Estate to instruct MGM that the second payment was to be made to the assignee-Haas Estate.

■ The Haas Estate's letter to MGM in November, 1976, complaining that MGM should have complied with the June 23, 1975, request for prepayment notification

**3.** Official Comment to UCC § 9–101.

came too late. In light of this acquiescence to both the MGM refusal and the method used for the first royalty payment, coupled with the fact that no request was timely made of MGM that payment be made to the Haas Estate, we hold that the assignment under § 9–318(3), even if initially effective, was invalidated by this inaction.

We find it unnecessary to decide whether the assignment was valid because of the peculiar facts of this case. The judgment below is AFFIRMED.