Leon WARRINGTON,
Plaintiff-Appellant,

v.

Ray DAWSON, Defendant-Appellee.

No. 85–4276.

United States Court of Appeals,
Fifth Circuit.

Sept. 9, 1986.

Chapman, Bobo, & Heaton, Fincher G. Bobo, Clarksdale, Miss., for plaintiff-appellant.

Merkel & Cocke, Charles M. Merkel, John H. Cocke, Clarksdale, Miss., for defendant-appellee.

Before GOLDBERG, HILL and JONES, Circuit Judges.

GOLDBERG, Circuit Judge:

### Dramatis Personae

RAY DAWSON (defendant-appellee): Farmer, "good ol' boy," and hero of this tragi-comedy.

LEON WARRINGTON (plaintiff-appellant): Financier, business associate and father-in-law of John Reitz, *infra*.

JOHN REITZ: Business associate and son-in-law of Leon Warrington, *supra;*

none-too-competent operator of Reitz Dusters and Sprayers, Inc. ("Reitz, Inc.").

GEORGE GREEN: President of Valley Bank; pillar of the community.

LUETTA DAWSON: Wife of Ray Dawson; supporting role in the telephone call scene.

JUNE KIND: Secretary at Reitz, Inc.; supporting role in the telephone call scene.

### Act I

The curtain rises on a small town in Mississippi. It is April, 1980, and John Reitz is wondering how to make a go of his failing cropdusting business. Deciding that a fresh infusion of cash is the best answer, he and his father-in-law, Leon Warrington, head down to the Valley Bank of Rosedale.

At the bank they are received cordially by the President, George Green. They have all played this scene before. Green states that the bank will require additional security before loaning any more money to Reitz, Inc. Reitz offers to assign Ray Dawson's account with Reitz, Inc. to the bank. That sounds fine to Green, so he takes an assignment of the Dawson account and accepts a promissory note for $13,360.27, signed by Reitz and Warrington as officers of Reitz, Inc. As a favor to his son-in-law, Warrington also signs a personal guaranty on the back of the note, as he has done several times before. Green gives Reitz an account acknowledgment for Dawson to sign. *Exeunt.*

### Act II

Several weeks pass, and the bank has still not received Dawson's account acknowledgment. The bank telephones Warrington and threatens to foreclose on the Reitz, Inc. note unless Dawson signs the acknowledgment. "I'll be right down," says Warrington.

At the bank, a secretary types up a new letter of acknowledgment for Dawson to sign. The letter is on Valley Bank stationery, with "George W. Green, President" imprinted at the top. It says:

April 22, 1980
Ray Dawson

West Helena, Ark.
Dear Mr. Dawson,
It is our understanding that you owe in excess of $18,000.00 to Reitz Dusters and Sprayers Inc. If this is correct, please indicate by signing below that you will make all checks payable on this account to Reitz Dusters and Sprayers Inc. and The Valley Bank in compliance with our lien on this account.
Thank you.
Sincerely,
George Green

The letter is signed by George Green; there is also a space for Ray Dawson's signature. Warrington takes the letter, hops into his pickup truck, and roars off.

The scene shifts to a rice field in Arkansas. Ray Dawson is out in the middle of the field on his tractor, about a mile from the highway, planting rice. It is a nice, sunny day, and Dawson is thinking pleasant thoughts. He does not have his reading glasses with him, because he is not planning to read anything out there on the rice field.

Suddenly, out of nowhere, Warrington roars up, trailing a cloud of dust. Dawson gets down off his tractor. Warrington hands him the letter and says "Reitz, Inc. has borrowed some money from Valley Bank and put up your account receivable as collateral. You should sign this." Dawson cannot read the letter, since he does not have his reading glasses with him, but he signs it anyway. Warrington takes the letter, hops back into his pickup truck, and roars away. Dawson gets on his tractor and heads back into the rice field, muttering under his breath "What was that all about?"

### Act III

It is several months later, and the Dawsons are paying their bills. Ray has a vague recollection that their checks to Reitz, Inc. are supposed to be made out differently now, so his wife Luetta, the bookkeeper in the family, telephones Reitz, Inc. to find out what to do. June Kind, secretary at Reitz, Inc. answers the phone

and confers with John Reitz. He says: "Tell her to make it out to Reitz, Inc." Ms. Kind relays this message to Mrs. Dawson, who makes out the check as instructed. During the course of the next year or so the Dawsons pay between $50,000 and $100,000 to Reitz, Inc. in this manner.

### Act IV

In February, 1981, the situation begins to deteriorate rapidly. Reitz, Inc. defaults on the promissory note held by the Valley Bank. Pursuant to his personal guarantee on the note, Warrington assumes liability for it and pays off the amount due. In return, the Valley Bank assigns all of its rights in the promissory note—including the Dawson account—to Warrington, who now stands in the shoes of the bank.

There has apparently been a falling-out in the Reitz family, for Warrington and Reitz are no longer related as father-in-law to son-in-law. Warrington demands payment from Reitz, Inc. under the note and from Dawson on the account. Receiving none, Warrington brings suit against both. Reitz, Inc. declares bankruptcy and is removed from the suit. Dawson responds that he has already paid everything he owed to Reitz, Inc. once, and would rather not do so twice. Warrington is unmoved. "See you in court," he says.

### Act V

Thus it is that this little human drama, like so many others before it, ends up in the courtroom. On February 28, 1985, the case went to trial in the U.S. District Court for the Northern District of Mississippi, Biggers, J.

Warrington, the plaintiff, put George Green on the witness stand and also testified on his own behalf. Dawson, the defendant, testified on his own behalf and put on his wife and Douglas Turner, a former commercial pilot at Reitz, Inc.

From Warrington's own testimony it is clear that his presentation of the acknowledgment letter to Dawson was not an occasion for much discussion:

Q. And threatened with foreclosure, you took a piece of paper and went over to Mr. Ray Dawson out in the field and handed him that piece of paper?

A. Yes, sir.

Q. Got off—him off a tractor where he was working?

A. Yes, sir.

Q. And I believe, according to your previous testimony, there was very little conversation at all between you and Mr. Dawson, is that right, sir?

A. Yes, sir.

Q. You just handed him a piece of paper and told him that you wanted him to sign it to acknowledge what he owed Reitz Dusters?

A. Yes, sir.

Dawson's account was one of trust betrayed:

I knew Leon and I knew John, and I never dreamed they would put something like that in front of me.

. . . .

I had too much confidence in the people that I was fooling with.

. . . .

Q. You signed it to verify an account, is that your statement?

A. Yes, sir.

Q. Okay. And you realized that you were giving someone a verification of account for some purpose?

A. Yes, sir. I gave a friend a verification of account.

Q. Okay. And you would not verify something for a friend or anyone if it was not true, would you?

A. I have learned a lot.

After hearing the evidence presented at trial and considering the arguments of counsel, the trial court found that Warrington had "wholly failed to prove that the bank provided Dawson with adequate notice of the assignment." The court stated that the bank employed "suspect methods" of appraising Dawson of the assignment, that the bank's failure to provide Dawson with a copy of the account acknowledgment was a "cardinal flaw" in Warrington's argument, and that Dawson should have had "more than just a fleeting

glance" at the document purporting to provide notice of an assignment of his account. Thus, the court found in Dawson's favor and held that the case should be dismissed. "Let an order issue accordingly," he wrote, and one issued. *Exeunt all.*

### Critical Review

Were we writing strictly as drama critics we could only applaud this poignant little play. In our capacity as legal reviewers, however, we are moved to suggest revisions of several key passages. In sum, we agree with the trial court that the notice of assignment Dawson received was insufficient both as to the manner of notification and as to the content of the notification.

■ The situation presented in this diversity case is governed by Mississippi Code § 75-9-318(3) (1972):

> The account debtor is authorized to pay the assignor until the account debtor receives notification that the amount due or to become due has been assigned and that payment is to be made to the assignee. A notification which does not reasonably identify the rights assigned is ineffective. If requested by the account debtor, the assignee must seasonably furnish reasonable proof that the assignment has been made and unless he does so the account debtor may pay the assignor.

The official Comments to the corresponding U.C.C. section elaborate as follows:

> Subsection (3) clarifies the right of account debtor to make payment to his seller-assignor in an "indirect collection" situation (see Comment to Section 9-308). So long as the assignee permits the assignor to collect claims or leaves him in possession of chattel paper which does

not indicate that payment is to be made at some place other than the assignor's place of business, the account debtor may pay the assignor even though he may know of the assignment....

> ....

> Subsection (3) requires reasonable identification of the account assigned and recognizes the right of an account debtor to require reasonable proof of the making of the assignment and to that extent validates such requirements in contracts or purchase order forms. If the notification does not contain such reasonable identification or if such reasonable proof is not furnished on request, the account debtor may disregard the assignment and make payment to the assignor.

U.C.C. § 9-318 comments 3, 5 (1972).[1] Mississippi Code § 75-1-201(26) (1972) provides a gloss on the requirement of notice: "A person 'notifies' or 'gives' a notice or notification to another by taking such steps as may be *reasonably required to inform the other* in ordinary course...." (emphasis added). Thus, in order for there to be an effective assignment under § 9-318(3), the account debtor must be notified that the account has been assigned and must be directed to make payment to the assignee rather than the assignor. The notification must reasonably identify the rights assigned and, if the account debtor is an ordinary consumer, the manner and content of notification must make sense to an ordinary consumer. *Surety Savings & Loan Co. v. Kanzig*, 53 Ohio St.2d 108, 372 N.E.2d 602, 605 (1978).[2]

■ As an initial matter, it is useful to ponder where the "notification" Dawson received fits within the usual categories of oral and written notification. It appears to

---

1. *See Estate of Haas v. Metro-Goldwyn-Mayer, Inc.*, 617 F.2d 1136, 1140 (5th Cir.1980):
   Thus, even though an account debtor is aware that a valid assignment has been made, if the account debtor continues to pay the assignor and the assignee does not object, the account debtor is not bound by the assignment. *See Ertel v. Radio Corporation of America*, 261 Ind. 573, 575, 307 N.E.2d 471, 473 (1974).

2. Warrington challenges the trial court's ruling as "clearly erroneous," Appellant's Brief at 3, 8,

and acknowledges that he has the burden of proof on the sufficiency of notice:
   The burden of proving that an account debtor received notification of an assignment and that the rights assigned were reasonably identified by that notification rests on the assignee. *Progressive Design, Inc. v. Olson Brothers Manufacturing Co.*, 200 Neb. 291, 263 N.W.2d 465, 469 (1978).
Appellant's Brief at 10.

us that Dawson in fact received less notice than would have been provided by *either* a proper oral or written notification. Warrington's statements out in the rice field did not amount to oral notification because, according to his own testimony, he merely told Dawson that "Reitz had borrowed some money from Valley Bank and that he was—they had put up his account receivable as collateral and he should sign this." Tr. at 65. Since Dawson did not have his reading glasses he could not read the letter; he had about the same written notice as he would have had if the postman had delivered a certified letter to him, asked him to sign a receipt for it, and then taken the letter away.[3] Normally, of course, when one "receives" a written communication one gets to keep it, "to have and to hold"[4] it. In construing the "reasonable notification" requirements of Mississippi Code § 75–9–504(3) (1972) (notice before sale of collateral), the Mississippi Supreme Court has concluded that oral notice is insufficient. *McKee v. Mississippi Bank & Trust Co.*, 366 So.2d 234, 237–38 (Miss. 1979). As for written notice, the court stated that

> If notice in writing is personally delivered to the debtor, or if it is sent by mail to the debtor's address (whether actually received by the debtor or not), such personal delivery or sending by mail will satisfy the requirement of notice as far as the contents of the notice are concerned.

*Id.* at 238.[5]

As noted above, U.C.C. § 1–201(26) contemplates that a person who "notifies" or

"gives" notice to another will take "such steps as may be reasonably required to inform the other in ordinary course." Courts have interpreted this provision to require more than a formal gesture of notification. In *Mallicoat v. Volunteer Finance & Loan Corp.*, 415 S.W.2d 347 (Tenn.Ct.App.1966), the court observed that "The requirement of notice is for the benefit and protection of the debtor" and stated that "This provision of the Act should be construed and applied in a manner to effectuate this salutary purpose...."[6] The court went on to quote an earlier Tennessee case as follows:

> Notice which is a mere gesture is not notice. The means employed must be such as one desirous of actually informing the absent party might reasonably adopt. *Mullane v. Central Hanover Bank & Trust Co.*, 339 U.S. 306, 70 S.Ct. 652, 94 L.Ed. 865.

*Mallicoat*, 415 S.W.2d at 351 (quoting *Burden v. Burden*, 44 Tenn.App. 312, 313 S.W.2d 566 (Tenn.Ct.App.1957)). Similarly, in *Bank of Salt Lake v. Church of Latter Day Saints*, 534 P.2d 887 (Utah 1975), the court found that notice to a clerical employee could not reasonably be construed as notice to the church. Where the bank had no direct dealings with the church, and had relied completely on what the assignor said and did, it had not taken "such steps as could be reasonably required to inform the Church of these assignments." *Id.* at 891.

■ In the present case the district court found that "the bank employed suspect

---

**3.** The dissent places great emphasis on the fact that something "came to Dawson's attention." Dissenting Opinion, *infra*, text accompanying notes 1–3. But *what* came to his attention? There are (at least) three ways that adequate notice of an assignment could have come to Dawson's attention: (1) Warrington could have read to him, *verbatim*, the text of an adequate notice of assignment; (2) If Dawson had been able to read such a notice out on the rice field, he could have done so then and there; or (3) Warrington could have left Dawson with a copy of such a notice, to be read later by Dawson (with reading glasses on) or by someone else. Manifestly, none of these three approaches was pursued.

**4.** On the use of this phrase, see the Dissenting Opinion, *infra*, note 5.

**5.** *Cf. Perdue Farms Inc. v. Motts*, 459 F.Supp. 7, 18–20, 27–29 (N.D.Miss.1978) (construing statute of frauds provision of Mississippi Code § 75–2–201 (1972)).

**6.** *Id.* at 350–51; *cf. Chase Manhattan Bank (N.A.) v. State*, 48 A.D.2d 11, 367 N.Y.S.2d 580, 583 (1975) (purpose of § 9–318 is "to protect the rights of an account debtor vis-a-vis an assignee"), *aff'd*, 40 N.Y.2d 590, 388 N.Y.S.2d 896, 357 N.E.2d 366 (1976).

methods of apprising Dawson of the assignment." Memorandum Opinion at 6. We agree. Waving a letter before a man in a rice field is not a reasonable way to notify him of an important change in his property rights.[7] Dawson had no reason to be prepared for a business discussion out on his rice field, and the evidence indicates that he was at a distinct disadvantage when obliged to do so.[8] Since Dawson did not have his reading glasses with him, and since Warrington did not leave him with a copy of the assignment notice, Dawson relied heavily on Warrington's representations in signing what he thought was merely a routine account verification.[9] "I gave a friend a verification of account," said Dawson at trial. Tr. at 146. The situation here is not altogether unlike that in *Weller v. A.T. & T.*, 290 A.2d 842 (Del.Ch.1972), where a 94–year-old woman of infirm mind and body let a trusted "friend" open her mail and handle her financial affairs. Mrs. Weller was prevailed upon by her "friend" to sign a form that enabled him to open a joint trading account in their names. *Id.* at 844. The court concluded that

[I]n light of her reliance on the perpetrator of the acts which deprived her of title to her securities and her own age and decrepitude ... I do not think Mrs. Weller can be charged with unreasonable action in not checking her accounts from time to time. I therefore conclude in view of all of the surrounding circumstances that Mrs. Weller did not have the required statutory notice of Mr. Jumper's dishonesty until February 19 or 20, 1970, and that she thereafter notified the issuers of her stolen securities within a reasonable time.

*Id.* at 845. In the present case, of course, Dawson is a healthy and intelligent man. Still, his situation is analogous to that in *Weller*. Without his glasses he could not see properly when, at the urging of his apparent friend Warrington, he signed what was supposed to be a routine account verification.[10]

■ Even if the bank had employed proper means of notifying Dawson we would not be persuaded that its letter of assignment "reasonably identified the rights assigned." We note first that the letter does not state in so many words that an account has been assigned, but merely

---

**7.** This does not mean that we depart from the time-honored principle that a man is presumed to have read, and will be held responsible for, an instrument that he signs in the absence of fraud, misrepresentation, or duress. *Cf. N & D Fashions, Inc. v. DHJ Industries, Inc.*, 548 F.2d 722, 727 (8th Cir.1976); *Upton v. Tribilcock*, 91 U.S. (1 OHO.) 45, 50, 23 L.Ed. 203 (1875); *Southeastern Enameling Corp. v. General Bronze Corp.*, 434 F.2d 330, 334 (5th Cir.1970). In the present case, however, we conclude that, as detailed below, analogues of fraud, misrepresentation, and duress *are* present.

**8.** The dissent observes that "It is no more remarkable to find a farmer in his fields than to find a banker in proximity to his vault." Dissenting Opinion, *infra*, text accompanying note 3. But the reason a banker routinely signs assignment notices in such close proximity to his vault is that his is a desk job and he is in the business of signing papers and filling out forms. Farming is not a desk job, and a farmer is not ordinarily prepared, or required, to conduct his financial affairs out on a rice field.

**9.** According to the dissent, if Dawson failed to become aware of the contents of the letter of notification, it was due "solely to his own neglect, carelessness, or sloth"! Dissenting Opinion, *infra*, text accompanying note 9. The dissent also suggests that Dawson would have suffered only "some slight inconvenience in stepping off his tractor to retrieve his reading glasses" and that "Dawson did not testify that he would have refused to sign the notification had he read and known its contents." *Id.*, text accompanying notes 11–12. But Dawson's uncontradicted testimony at trial was that "I did not have my glasses out there," Tr. at 124, that "I was in a field that is located on the Phillip County line on Hwy. 1, back about a mile off the highway," *id.* at 122, and that "If I would have read it, I would have not signed it because that was incorrect," *id.* at 144.

**10.** *Cf. John Deere Co. v. Neal*, 544 S.W.2d 514, 517 (Tex.Civ.App.1976):

It is apparent from the record that Neal is an intelligent man but he is not shown to be so experienced in secured transactions as to be alerted by the facts in evidence that John Deere Company was in fact requesting payment *to be made to it* as assignee of the chattel paper. The cited section emphasizes the necessity of the assignee making its rights clear to a debtor....

refers obliquely to "our lien on this account." While it may be that under U.C.C. § 9-318 an ordinary consumer is charged with understanding a proper notice of "assignment," it is not all clear that he is also presumed to know what a "lien" is.

The trial court found as a fact that "Ray Dawson farms four tracts of land located in Arkansas and Mississippi. Each tract that Dawson farms is maintained as a separate corporation." Memorandum Opinion at 2. The court further found that "the testimony of Ray Dawson and defendant's exhibits entered into evidence at trial clearly establish that Dawson maintained four separate corporate accounts with Reitz, Inc." *Id.* at 7. The assignment letter, however, speaks simply of "this account" and reads as though Dawson individually had an account with Reitz, Inc.: "It is our understanding that you owe in excess of $18,000.00 to Reitz Dusters and Sprayers Inc."[11] Thus the court concluded that "the account acknowledgment per se does not reasonably identify the rights assigned." *Id.*

Other courts have reached similar conclusions. In *Progressive Design, Inc. v. Olson Brothers Mfg. Co.*, 263 N.W.2d 465 (Neb.1978), defendant Olson Brothers received a letter purporting to assign "your contract with [Progressive Design, Inc.]." *Id.* at 467. At the time, Olson Brothers had several contracts with Progressive. The court noted that

> The letter of August 14, 1970, did not identify the contract by date, or by the type or kind of contract, nor did it refer to the product or services contracted for, nor even the amount of money involved. It did not indicate whether performance or only payment had been assigned.

*Id.* at 468. The court accordingly held that the notice of assignment had not sufficiently identified the rights assigned. Similarly, in *Bank of Salt Lake v. Church of Latter Day Saints, supra,* the court based its holding of insufficient notice partly on the fact that the bank had duplicated some of the invoice numbers on its notices of assignment; another invoice greatly overstated the amount assigned; and yet another invoice listed a receivable from a business entity not a party to the lawsuit. 534 P.2d at 891. *Cf. Citizens State Bank of Corrigan v. Jackson Corp.*, 537 S.W.2d 120 (Tex.Civ.App.1976) (notice on invoices to "make checks payable to" a bank did not reasonably identify any rights assigned).

Finally, even if the bank had used both a proper manner and content of notification, we would still be troubled by the fact that the bank never objected while, over the course of a year or more, Dawson's corporations paid between $50,000 and $100,000 to Reitz, Inc. by checks made payable solely to Reitz, Inc. The district court found that "Throughout this period The Valley Bank never complained about the way payment was made to Reitz, Inc." Memorandum Opinion at 4. As this court noted in *Estate of Haas v. Metro-Goldwyn-Mayer, Inc.*, 617 F.2d 1136, 1140 (5th Cir.1980), "even though an account debtor is aware that a valid assignment has been made, if the account debtor continues to pay the assignor and the assignee does not object, the account debtor is not bound by the assignment." *Cf. Bank of Salt Lake*, 534 P.2d at 891; *First National Bank v. Board of Education*, 68 Ill.App.3d 21, 24 Ill.Dec. 670, 673, 385 N.E.2d 811, 814 (1979); *First Trust and Savings Bank v. Skokie Federal Savings*, 126 Ill.App.3d 42, 81 Ill.Dec. 246, 248, 466 N.E.2d 1048, 1050 (Ill.App.Ct.1984).

The critic's function having been performed, we AFFIRM the decision of the district court.

AFFIRMED.

EDITH HOLLAN JONES, J., concurs in the result.

ROBERT MADDEN HILL, Circuit Judge, Dissenting:

#### Epilogue

Before the curtain falls on our drama, I am compelled to add my own critique. In

---

11. Dawson testified that at the time he signed the notice of assignment his farming corporations actually owed only $9,000 to Reitz, Inc. Tr. at 124.

my opinion the majority has interpreted the Uniform Commercial Code (U.C.C.) in a way which conflicts both with the U.C.C. and the common law of Mississippi. In coming to the aid of a careless agribusinessman from a fate he imposed upon himself by his own neglect, the majority in one stroke of the pen abolishes the duty to read, amends the U.C.C. requirements of the manner and content of an assignment, and restructures the U.C.C. framework of debtor/assignee notification.

## I. The Manner of Notification

### A. The Statute

I begin, as the majority does, with the language of the U.C.C.: "The account debtor is authorized to pay the assignor until the account debtor receives notification that the amount due or to become due has been assigned and that payment is to be made to the assignee." Miss.Code Ann. § 75–9–318(3) (1972). The import of this language, for our purposes, is that an account debtor is not authorized to pay the assignor once he "receives notification." Neither this provision nor its accompanying official commentary gives any clue as to the *manner* of notification required.

The general definitions of the U.C.C. give somewhat greater content to the phrase "receives notification." The definition of "notice" indicates that a person may be considered to have constructive notice of a fact even though he has no actual knowledge of it:

A person has "notice" of a fact when

(a) He has actual knowledge of it; *or*

(b) He has received a notice or notification of it; *or*

(c) from all the facts and circumstances known to him at the time in question he has reason to know that it exists.

Miss Code Ann. § 75–1–201(25) (1972) (emphasis added). The U.C.C. makes it clear that receipt of a notification can occur even when the notification does not actually reach the person intended to be notified:

A person "receives" a notice or notification when

(a) it comes to his attention; *or*

(b) it is duly delivered at the place of business through which the contract was made or at any other place held out by him as the place for receipt of such communications.

Miss.Code Ann. § 75–1–201(26) (1972) (emphasis added).

The U.C.C. thus does not prescribe any particular manner in which the notification contemplated in section 75–9–318(3) must be received. " 'Notice' and 'notification' have specific meanings when used in the U.C.C., Miss.Code Ann. § 75–1–201(25), and do not have to be in written form." *Perdue Farms Inc. v. Motts, Inc. of Mississippi*, 459 F.Supp. 7, 19 (N.D.Miss.1978) (dicta). Nor does the U.C.C. require that the person to be notified sign a written statement to evidence the notification; section 75–1–201(26) requires only that the notification be "duly delivered." Nevertheless, out of an abundance of caution, Warrington and the Valley Bank took both of these steps. The notification was reduced to writing, and Dawson was required to sign an acknowledgment to show that he had been notified.

The majority opinion fails to mention the U.C.C. definition of "receives" notification; had it done so, it would have had a more difficult time explaining how the manner of notification here was inadequate.[1] The

---

1. The majority inexplicably overlooks the U.C.C. definition of "receives" notification in favor of focusing on the somewhat looser language of the U.C.C. definition of "gives" notification. Compare the two, given side by side in § 75–1–201(26):

> A person "notifies" or "gives" a notice or notification to another by taking such steps as may be reasonably required to inform the other in ordinary course whether or not such

other actually comes to know of it. A person "receives" a notice or notification when

>   (a) it comes to his attention; or
>   (b) it is duly delivered at the place of business through which the contract was made or at any other place held out by him as the place for receipt of such communications.

The article 9 provision at issue speaks only of the effect when the account debtor "receives notification." *See* § 75–9–318(3). Thus, I see

U.C.C. requires only one of the two prongs of the definition of "receives" notification to be met for the notification to be effective. *See* § 75–1–201(26). The evidence clearly establishes that here both were met. There can be no doubt, even from Dawson's own testimony, but that the notification "came to his attention." Nor can there be doubt of the fact that the notification was delivered "at the place of business through which the contract was made."

The parties agree that the notification—putting to one side for a moment the sufficiency of the content of that notification, *see* part II *infra*,—came to Dawson's attention when Warrington approached him in the rice field. The district court found that George Green, the president of the Valley Bank, had called Dawson on the same day that Green discussed with the cropduster John Reitz the assignment of Dawson's account with Reitz. Dawson testified that Warrington later approached him and asked him to sign "that paper." Dawson admitted at trial that he signed the acknowledgment of notification.[2] Although Dawson's version of what he thought he was signing has wavered during this litigation,[3] whatever it was that he signed did "come to his attention" long enough for him to acknowledge it with his signature.

Nor is it open to doubt that the notification was delivered at Dawson's "place of business through which the contract was made." Dawson's business was farming, and it is undisputed that the account Dawson had with Reitz represented bills for cropdusting services performed on Dawson's lands. It is no more remarkable to find a farmer in his fields than to find a banker in proximity to his vault. While a rice field is not the best location for transacting business, it is a "place of business" as surely as a banker's place of business is his bank. There is no evidence in the record that Dawson requested Warrington to take the notification to Dawson's "business" office, nor that such an office even existed. Accordingly, the plain language of the U.C.C., in two alternate and independent ways, indicates that Dawson received notification of the assignment in an effective manner.

B. Judicial Interpretation of the Statute

The authorities relied on by the majority in its interpretation of section 75–9–318(3) do not hold to the contrary. In *McKee v. Mississippi Bank & Trust Co.*, 366 So.2d 234, 237–38 (Miss.1979), referred to by the majority, the Mississippi Supreme Court was called upon to pass on the correctness of a jury instruction which stated that the "reasonable notification" required by Miss. Code Ann. § 75–9–504(3) (1972) before sale of collateral could be made either orally or in writing. The *McKee* court, interpreting the word "send,"[4] determined that oral notification was insufficient and reversed the judgment for the creditor who could not prove the debtor's timely receipt of written notice. Section 75–9–504(3) varies from the language of the provision we must interpret, *see also supra* note 1, and *McKee* is thus not controlling here. In any event, there is no support for the majority's suggestion that *McKee* requires that one be able to keep the notice, or "to have and to

---

no reason to construe the definition of "gives" notification nor to iron out any inconsistency between these two definitions. Accordingly, the majority's heavy reliance on the reasonableness determination contemplated by the definition of "gives" notification is misplaced. Perhaps the majority is only following the biblical maxim that to give is better than to receive. *See Acts* 20:35.

**2.** In his initial answer to Warrington's complaint Dawson denied that he had acknowledged this notification. However, at trial Dawson admitted signing it.

**3.** In an affidavit in support of a motion to dismiss, Dawson swore that he believed the notification to be a "letter" which was a verification of account to "help [Warrington] and Reitz form some sort of partnership." At trial, Dawson did not mention anything about the formation of a partnership, testifying instead that the verification of account was to help them "borrow some money."

**4.** *See* Miss.Code Ann. § 75–1–201(38) (1972).

hold" it.[5] Instead, what *McKee* seems to require is what Dawson got: "notice in writing personally delivered to the debtor."[6] The majority's citation of jurisdictions outside Mississippi is similarly unpersuasive.[7]

Appreciation of drama requires a willing suspension of belief; however, the majority's reliance on *Weller v. American Telephone & Telegraph Co.,* 290 A.2d 842 (Del. Ch.1972), transforms our play into a true fantasy. The suggestion that Dawson, a vigorous and independent forty-three-year-old businessman, shrewd enough to operate three farming corporations and one partnership in two states, was in a position "analogous" to that of the ninety-four year old woman of infirm mind and body who was victimized in *Weller* exposes the weakness of the majority's position. The Delaware court, sitting as a court of equity, was obviously moved by the fact that the woman, a "lonely and trusting person ... had every reasonable right to trust a fami-

5. The unattributed quotation of the words "to have and to hold" in the majority opinion is somewhat puzzling. This phrase is familiar enough to be suggestive of some importance in some area of the law, perhaps that of the matrimonial, but its origin is left indistinct. *Cf.* The Episcopal Church, *The Book of Common Prayer* 427 (proposed ed. 1977) ("In the Name of God, I, *N.,* take you, *N.,* to be my wife, to have and to hold from this day forward...."). This phrase does not appear in *McKee.*

6. Had the notification simply been waved under Dawson's nose, without giving him an opportunity for him to sign it, his situation would be more sympathetic. However, Warrington waited for Dawson to sign it. Dawson's signature was an affirmative act, one which he could have delayed had he any doubts—or any cares—as to its contents.

7. Contrary to the suggestion by the majority, *Surety Savings & Loan Co. v. Kanzig,* 53 Ohio St.2d 108, 372 N.E.2d 602, 605 (1978), makes no indication of what *manner* of notice is required by the U.C.C.: it speaks only to the *content* of the notice. *See id.,* 372 N.E.2d at 603. Moreover, the portion of the case cited by the majority, which is a part of Judge Whiteside's opinion, is not controlling authority, even in Ohio. Decisions of the Supreme Court of Ohio are binding only as to the language in the courts' syllabus, *see id.,* 372 N.E.2d at 603–04, but not as to the language in the individual judge's opinion, *see, e.g., id.* 372 N.E.2d at 604–06, which is merely dicta. *See* Supreme Court Rules for the Reporting of Opinions, Rule 1(B), *reprinted in* 1985/86 Rules Governing the Court of Ohio at 807 (1985).

In *Mallicoat v. Volunteer Finance & Loan Co.,* 57 Tenn.App. 106, 415 S.W.2d 347 (1966), an intermediate Tennessee court interpreted U.C.C. § 9–504(3), which required a creditor to send notification to a debtor prior to the sale of collateral. The *Mallicoat* creditor's only efforts to notify the debtors were (1) a registered letter which was returned "unclaimed" and (2) "posters" which the creditor could not recall when or where posted. *Id.,* 415 S.W.2d at 349. The *Mallicoat* court came to the unremarkable conclusion that such notice was inadequate. Even had the citation of *Mallicoat* not been subject to the same objection as one of those to the citation of *McKee*—namely, that it interprets a different and differently worded provision of the U.C.C. rather than the section at issue here—the manner of Warrington's notice to Dawson was far more effective.

Overall, I believe that the majority's reliance on *McKee, Kanzig,* and *Mallicoat* is misplaced, for each of these involved a debtor who was an ordinary consumer. Dawson's account, in contrast, was clearly a commercial one. *Cf.* Miss. Code Ann. § 75–9–109(1) (1972) (definition of "consumer goods" as those "used or bought for use primarily for personal, family, or household purposes"). Even if a reasonableness test is used, what *is* unreasonably poor notice to a consumer may not be ineffective in the commercial context.

*Bank of Salt Lake v. Church of Jesus Christ of Latter-Day Saints,* 534 P.2d 887 (Utah 1975), is also distinguishable. The church had purchased furniture on credit, and the bank attempted to notify the church of an assignment of the account only by notifying a clerical employee in the Seminaries and Institutes Department. The employee had no authority to sign any documents, and so informed the representative of the bank, who replied that he would see to it that the proper church department was informed. On these facts the Utah Supreme Court held that "[t]he subject notices never came to the attention of the church, neither were they delivered to the place of business at which the contract of purchase was made, nor at any other place held out by the church as the place for the receipt of such communications." *Id.* at 891 (footnote omitted); *see also* U.C.C. § 1–201(27) (notice received by an organization is effective only when brought to the attention of the individual conducting the original transaction). By contrast, Dawson was personally notified, not through his agent or employee. The notice came to his personal attention (though he chose not to read it) and was delivered to him at his farm, the place of business corresponding to the cropdusting account.

ly which took her in and which she had known intimately before she moved into its home." *Id.* at 845. This holding, one obviously based on the quasi-fiduciary relationship between the old woman and her defrauders, has little application to the commercial relations between businessmen.[8]

A far more helpful analogy than one to *Weller* may be made to *Ertel v. Radio Corp. of America,* 261 Ind. 573, 307 N.E.2d 471 (1974). In *Ertel,* in construing U.C.C. section 9–318(3), the section at issue in our case, the court examined the adequacy of notice given to an account debtor by an assignee. The assignee sent by certified mail written notice of the assignment to the debtor, whose loading dock employee signed the return receipt, but the notice never reached the debtor's accounting department. The *Ertel* court held that the notice was sufficient because delivered at the debtor's place of business. 307 N.E.2d at 474. The court reasoned:

> The notice was duly delivered and received at the appropriate place by an authorized agent of [the debtor]. The negligence of [the debtor] should not be charged to [the assignee], but rather to [the debtor]. To hold otherwise is to circumvent the obvious policy behind [U.C.C.] § 1–201(26).

*Id.*

As far as the *Ertel* debtor's accounting department was concerned, the notice of assignment was as lost as if it had never been given a copy. Similarly, if Dawson failed to become aware of the contents of the letter of notification, it was due solely to his own neglect, carelessness, or sloth in failing to pause to get his reading glasses and read it.[9] Commerce requires clear evi-

---

**8.** If one felt that *Weller* deserved the analysis usually used to distinguish helpful precedent from unhelpful, the legal basis of *Weller* is also at variance with our situation. The *Weller* court interpreted U.C.C. § 8–404(2), which provided that an owner of a security must notify the issuer "within a reasonable time after he has notice" of its loss. The court held that the forgery perpetrated on the old woman's securities, since it was concealed from her, did not provide immediate notice to the woman of her loss. Warrington, on the other hand, took active steps to bring the assignment to Dawson's attention by approaching him at the farm. There was no evidence that Warrington or the Valley Bank (or anyone else) ever attempted to conceal the assignment from Dawson.

**9.** The majority's sympathy for the poor-sighted Dawson is of questionable foundation. The cross-examination of Dawson is revealing; it indicates, at the least, that Dawson could read the notification well enough to know that the Valley Bank was involved:

Q. And you did not contact the Valley Bank, did you?
A. I did not know of a Valley Bank.
Q. It was right there in big black print on the top right-hand corner, and even with your eyesight, you could have read that sitting on a tractor that day?
A. That's right.
Q. You could have read that, couldn't you?
A. Yes, I could have read that, but he did not let me have a copy to read myself.
Q. You had it long enough to sign it, didn't you?
A. Yes.
Q. And you saw the—

A. What he told me was a verification of account, and I got hundreds of them ever year.
Q. And having seen the Valley Bank on that letter, did you bother to call the Valley Bank to inquire about it?
A. No, sir.
Q. Well, when you signed this Plaintiff's Exhibit 3, to verify the account, did you anticipate that this verification would end up in the hands of the Valley Bank?
I suppose you did, did you not?
A. Yes, that is what a verification is for.
A phone call to the Valley Bank would have shifted the burden to the bank to provide proof of the assignment. *See* Miss.Code Ann. § 75–9–318(3) (1972).
Moreover, Dawson's vision was curiously selective:
Q. This is Plaintiff's Exhibit 3, the letter of agreement that was brought to you when you were in the field, if you could, please, tell us whether of not that is your signature on Plaintiff's Exhibit 3?
A. Yes, sir.
Q. All right. Now, Mr. Dawson, when you were driving the tractor that day, I guess it was a clear day and the sun was shining?
A. Yes, sir.
Q. All right. You had plenty of light out there. If you had chosen to read the letter, you could have read it, couldn't you?
A. I doubt it.
Q. All right. You just cannot see that well, can you?
A. Not up close.
Q. Look at that letter and explain to me, then, how you knew where to sign your name on the letter?

dence of transactions, and Dawson's signature on the notification could be no more straightforward as an indication of his knowledge of the assignment. In the commercial world contemplated in the U.C.C., delivery of notification is sufficient without proof of the mental state of the one to be notified, at least where, as here and in *Ertel*, the debtor's signature is irrefutable evidence of that delivery.

### C. The Duty to Read

Even if this reading of the U.C.C. is incorrect, and the statutory framework is insufficient to determine what manner of notification is required, the background common law provides the answer. Even the majority does not suggest that the U.C.C. specifically requires the outcome it reaches; the majority recognizes that it must interpret the statute, which, at least upon initial examination, does not give dispositive guidance. The U.C.C. itself recognizes that gaps in its provisions must be filled by applicable supplementary general principles of law:

> Unless displaced by the particular provisions of this code, the principles of law and equity, including the law merchant and the law relative to capacity to contract, principal and agent, estoppel, fraud, misrepresentation, duress, coercion, mistake, bankruptcy, or other validating or invalidating cause shall supplement its provisions.

Miss.Code Ann. § 75–1–103 (1972).

One such supplementary principle of law is, as the majority states it, that a person "is presumed to have read, and will be held responsible for, an instrument that he signs in the absence of fraud, misrepresentation, or duress," *ante* at 1538 n. 7. This principle has long been the settled rule in Mississippi. *See, e.g., Garrett v. Pigford,* 218 Miss. 840, 67 So.2d 885, 887 (1953); *Hunt v. Davis,* 208 Miss. 710, 45 So.2d 350 (1950); *Alliance Trust Co. v. Armstrong,* 185 Miss. 148, 186 So. 633, 635 (1939); *Mid-Continent Telephone Corp. v. Home Telephone Co.,* 319 F.Supp. 1176, 1196 (N.D. Miss.1970).[10] The evidence could not have supported a finding of fraud, misrepresentation, or duress,[11] and Dawson should be held responsible for his signature.

Warrington did not defraud Dawson, nor did he misrepresent the contents of the notification. For an ancillary representation to void an agreement, it must be (1) false and (2) a material inducement to the execution of the agreement. *See McGee v. Clark,* 343 So.2d 486, 488–89 (Miss.1977). There is no evidence that anything Warrington told Dawson was false. Taking Dawson's version as accurate, Warrington told him that the notification was a verification of account for the purpose of obtaining a loan. And that it was. It was also, however, an assignment, a fact which Dawson later did not recall Warrington telling him. Dawson did not testify that Warrington concealed this fact from him, nor even that he remembered Warrington *not* telling him that it was an assignment. Moreover, Dawson did not testify that he would have refused to sign the notification had he read and known its contents. Dawson testified that he "was in a hurry" and that their meeting in the field was brief. Indeed, Dawson testified that it was his habit *not* to read the instruments he signed. Thus, it is difficult to conclude that Warrington's statements were a material inducement to receiving Dawson's signature.

A. I can see a straight line under another straight line.
Q. Examine it again realizing that you cannot see without straining, if you can follow right along the top of the line?
A. Well, you would have to see through my eyes to understand I can see good enough for that kind of thing, but I cannot see good enough to read.
Q. *You are going to see what you want to see and you don't see what you don't want to see?*

A. *That is true.*
(emphasis added).

**10.** The law of Mississippi is not unique in this respect. The "generally prevailing law" is that "one is presumed to have read a contract that one signs." *In Re Cajun Electric Power Cooperative, Inc.,* 791 F.2d 353, 359 (5th Cir.1986).

**11.** The district court did not determine any issues of fraud, misrepresentation, or duress.

Neither was Dawson's signature obtained through duress. "Duress and compulsion go to the reality of consent to a contract. The ultimate fact for determination is whether the complaining party was deprived of free exercise of his own will."

*Duckworth v. Allis-Chalmers Manufacturing Co.*, 247 Miss. 198, 150 So.2d 163, 165 (1963). Warrington did not come armed, nor did he make any threats. He simply approached Dawson and asked him for his signature. Dawson would have suffered some slight inconvenience in stepping off his tractor to retrieve his reading glasses, but by no means was his will overborne by Warrington's simple request.[12]

The majority's attempt to dispel the well established duty to read is unpersuasive. The majority does not purport to find fraud, misrepresentation, or duress in this record. It does conclude, however, that "analogues" of these exceptions are present. I am, however, at a loss to understand the genesis or the contours of this new doctrine. In any event, a federal court, bound in this instance to apply the law of Mississippi, ought to be cautious in expanding these exceptions to undefined and perhaps undefinable reaches. I see no injustice in holding Dawson to what he signed.

### II. The Content of the Notice

Turning to the adequacy of the contents of the notification provided to Dawson, my starting point is again the statutory provisions: "A notification which does not reasonably identify the rights assigned is ineffective." Miss.Code Ann. § 75–9–318(3) (1972). The official commentary states that "reasonable identification of the account assigned" is required. U.C.C. § 9–318 comment 5 (1972). Although the majority seems more troubled by the manner of notification than its contents, it concludes that the contents were also inadequate. I must again respectfully disagree.

The U.C.C. "establishes no specific requirements as to the form of the notice of assignment." *First National Bank of Rio Arriba v. Mountain States Telephone & Telegraph Co.*, 91 N.M. 126, 571 P.2d 118, 120 (1977). In *Rio Arriba*, the debtor continued to pay the assignees after the debtor had received a copy of the assignment. The assignment identified the account assigned, but it made no specific instruction as to whom should be paid. The Supreme Court of New Mexico affirmed the trial court's judgment for the assignee, reasoning that "[t]he assignment document in this case explicitly identified the rights assigned. If [the debtor] was unclear as to the effect of the assignment, it could not safely proceed to make payments." *Id.* Quoting the U.C.C. commentary, the court elaborated:

> What is "reasonable" is not left to the arbitrary decision of the account debtor; if there is doubt as to the adequacy either of a notification or of proof submitted after request, the account debtor may not be safe in disregarding it unless he has notified the assignee with commercial promptness as to the respects in which identification or proof is considered defective.

*Id.*

The notification given to Dawson was simple, clear, and to the point. It stated that Dawson owed Reitz Dusters and Sprayers, Inc., and indicated that the Valley Bank had a lien on this account. It specifically directed Dawson to make his checks payable on this account to both the cropduster and the bank. The notification contained no jargon, legalese,[13] or fine print. Had Dawson bothered to read it

---

**12.** I further cannot agree with the majority's suggestion that Warrington stood in a fiduciary relation to Dawson. The two were merely casual friends and business acquaintances.

**13.** I cannot agree with the majority's suggestions that the word "lien" in the notification was faulty because (1) Dawson was a mere "ordinary consumer," and (2) Dawson could not be presumed to know what a lien was. Dawson was not a "consumer" with respect to his commercial account with the cropduster. *Cf.* Miss. Code Ann. § 75–9–109(1) (1972). Dawson testified that he had applied for and taken out several secured loans in his farming operations, and he surely knew what a lien was.

before signing it, it cannot be doubted that he would have had some indication that his account had been assigned to the Valley Bank.

A similar notification of assignment was upheld in *Marine National Bank v. Airco, Inc.*, 389 F.Supp. 231 (W.D.Pa.1975). The notification of assignment referred only to "all of [the assignor's] accounts receivable and inventory" and "all moneys due." *Id.* at 232. At the time of the notification, the debtor had not yet even received the performance from the assignee which would obligate the debtor to make payment on the accounts. *Id.* at 233. The court granted summary judgment against the debtor, reasoning that the assignment was specific enough to meet the requirements of section 9–318(3): "[The assignor and the debtor] only had one agreement at any relevant time, so that [the debtor] could not have reasonably failed to understand what accounts or rights [the assignee] was claiming...."

*Id.* Similarly, Dawson should reasonably be required to understand the subject of the assignment notification handed to him by Warrington.

The district court's holding as to the contents of the notification, accepted by the majority, was that the notification was phrased as if Dawson had a single individual account with the cropduster, when in fact he kept his books to reflect four accounts with each of his four corporations[14] corresponding to his four tracts of land. However, the evidence at trial was undis-

puted that the cropduster maintained his account as a single one with Dawson individually. Warrington and the president of the Valley Bank testified without contradiction that they had no knowledge of Dawson's corporate accounts. Dawson never informed the cropduster or the bank, so far as the record indicates, that his account was a corporate one. The instrument signed by the cropduster assigned "my account with Ray Dawson" to the bank. As far as his relations with the outside world were concerned, Dawson operated his business as an individual proprietorship.[15]

Thus, the majority's heavy reliance on *Progressive Design, Inc. v. Olson Brothers Manufacturing Co.*, 200 Neb. 291, 263 N.W.2d 465 (1978), is inappropriate. The *Progressive Design* assignment was one of several transactions and several different types of products. Since the notification did not identify any of the various contracts, nor the products or amounts involved, the Supreme Court of Nebraska held that the rights assigned were not reasonably identifiable. Here, by contrast, only one product or service was involved: cropdusting. There was no testimony that Dawson had doubts about which accounts had been affected by the letter he signed. Dawson had an ongoing transaction with the cropduster, not several independent ones. At the least, the notification alerted Dawson to the possibility of an assignment of the four accounts with the cropduster, creating a duty to inquire further.[16]

---

**14.** The majority and the district court each state that Dawson maintained four corporations. Dawson testified that he had three corporations and that the fourth enterprise was a partnership in which he was a partner.

**15.** Dawson apparently recognizes this fact. Suit has proceeded against him individually, and he has not sought to substitute any corporate entities.

**16.** Although he denied that he learned of the assignment from Warrington's notification, Dawson's testimony did reveal his prior knowledge that his account had been assigned. Before making out his next check, Dawson called the cropduster to ascertain who was to be the payee. Dawson testified vaguely that: "After

Leon [Warrington] was out in the field, John [Reitz] found out that Leon had done that and he said some things around other people and I had got the word back that I had signed an assignment, so I called down there at the—To make sure that I did right." Dawson's wife testified that he had told her a call was necessary "because he thought there was supposed to be something else on the check, but he did not know what." Any uncertainty in Dawson's mind was thus due to his confusion about who the assignee was, not about which accounts had been assigned. Of course, had he read the notification that he signed, the identity of the assignee would have been clear.

### III. Waiver

The majority accepts a proffered doctrine of assignee waiver which runs contrary to the statutory framework. The U.C.C. places the burden on the notified debtor, not on the assignee, to take the initial steps to resolve any doubt as to the validity of the assignment: *"If requested by the account debtor,* the assignee must seasonably furnish reasonable proof that the assignment has been made and unless he does so the account debtor may pay the assignor." Miss.Code Ann. § 75–9–318(3) (1972) (emphasis added). The terms of the statute do not require the assignee to constantly monitor the faithfulness with which the notified debtor is paying. Instead, the statute contemplates that the notified debtor's request will be the triggering inquiry.

*Estate of Haas v. Metro-Goldwyn-Mayer, Inc.,* 617 F.2d 1136 (5th Cir.1980) (interpreting California U.C.C.), is not to the contrary. The *Haas* court held as ineffective a notification of conditional assignment which did not state to whom payments should be made but only requested that the assignor and assignee were to be notified before payment so that the assignor and assignee could then jointly give further instructions. *See id.* at 1139–40. The debtor responded to this notification by informing them both that it could not comply. Instead of replying with indentification of its right to payment and reasonable proof thereof, as the U.C.C. contemplates, the assignee did nothing. On these "peculiar" facts, the *Haas* court concluded that the debtor need not have altered its payments. *Id.* at 1140–41.

Rather than contacting the Valley Bank, from which he could have demanded proof of the assignment, Dawson contacted only the assignor/cropduster. His ignorance of the identity of the assignee, whose name was boldly printed on the notification, was due in sole measure to his failure to read the notification he signed. Although the Valley Bank did not become aware of Dawson's erroneous payments until the demise of its assignor, the U.C.C. did not extinguish its rights. As between the two innocent parties, the U.C.C. places the initial burden of inquiry on Dawson, the notified debtor. Accordingly, I cannot agree that the Valley Bank has waived its rights.

### IV.

With a quick dissenting bow, I now make my exit from the stage. I leave it to the majority to take as many curtain calls for this drama as are deserved.