**SOUTHERN FLORIDABANC SAVINGS ASSOCIATION, Appellee,**

v.

**PROFESSIONAL INVESTMENTS OF AMERICA, INC., et al., Appellants.**

[Cite as *S. Floridabanc Sav. Assn. v. Prof. Inv.
of America* (1991), 77 Ohio App.3d 435.]

Court of Appeals of Ohio,
Cuyahoga County.

Nos. 58874, 58875.

Decided Sept. 30, 1991.

**436**

*McDonald, Hopkins & Hardy, Steven L. Gardner* and *Michael L. Jordan,* for appellee.

*Charles M. Rosenberg,* and *Jeffery A. Key,* for appellant Peter E. Shimrak.

*John J. Duffy,* for appellants Professional Investments of America, Inc. and PIA Associates.

---

PATRICIA A. BLACKMON, Judge.

In these consolidated appeals, defendants, Peter E. Shimrak, PIA Associates ("PIA Assoc."), and Professional Investments of America, Inc. ("PIA, Inc."), appeal from the judgment of the trial court entered in favor of plaintiff, Southern Floridabanc Savings Association ("Southern Floridabanc"), for breach of an assignment. For the reasons set forth below, we affirm.

I

In August 1984, PIA, Inc., Shimrak, and Philip Miller formed PIA Assoc., a general partnership, for the purpose of purchasing the Continental West Apartments and converting them into condominiums. Under the terms of this partnership agreement, Miller is entitled to twenty-five percent of the net profits resulting from the conversion.

In 1985, Miller sought a $675,000 loan from Southern Floridabanc, in connection with the refinancing of certain debts which were unrelated to PIA Assoc. As security for this loan transaction, Miller executed a Collateral Assignment of Partnership Interest and Proceeds in which he assigned his right to twenty-five percent profits and distribution from PIA Assoc. to Southern Floridabanc. Thereafter, on or about June 5, 1985, Miller and Adriane Underwood, a former Southern Floridabanc employee, obtained the signature of Shimrak and PIA, Inc.'s president and sole shareholder, Howard Ferguson, on a document which provided in relevant part as follows:

*"CONSENT*

"The undersigned, PROFESSIONAL INVESTMENTS OF AMERICA, INC., an Ohio corporation ('PIA'), and Peter S. Shimrak, being the General Partners with Philip S. Miller pursuant to the attached Partnership Agreement, hereby acknowledge the terms and conditions of the foregoing Assignment of Partnership Interest and Proceeds of Philip S. Miller, to SOUTHERN FLORIDABANC SAVINGS ASSOCIATION, and hereby consents thereto. Until otherwise notified by ASSIGNEE, all Partnership distributions whatsoever allocable to ASSIGNOR's share of the Partnership shall be made directly to ASSIGNEE. In addition, the undersigned hereby covenants to give ASSIGNEE, SOUTHERN FLORIDABANC SAVINGS ASSOCIATION, 5455 No. Federal Highway, Suite 1, Boca Raton, Florida, 33431, written notice of any

default by ASSIGNOR, Philip S. Miller * * * *." (Hereafter, this document is referred to as the "consent.")

It is undisputed that a Uniform Commercial Code certification statement was duly executed and filed in connection with this document.

Thereafter, contrary to the assignment language set forth in the "consent," PIA Assoc. disbursed to Miller partnership distributions of $100,000 in October 1985, December 1985, and February 1986. In January 1986, Miller defaulted on the loan from Southern Floridabanc.

Southern Floridabanc subsequently brought suit against Shimrak, PIA, Inc., and PIA Assoc., alleging in its first amended complaint that Shimrak and PIA, Inc. were given notice of Miller's assignment, had consented to it, and had breached their obligations to transmit Miller's partnership distributions to Southern Floridabanc. Defendants submitted answers in which they denied liability and affirmatively averred that the notice provided was not reasonable. In addition, defendant PIA, Inc. asserted that Southern Floridabanc had waived its entitlement to the distributions by failing to promptly assert its rights. The matter proceeded to a bench trial on September 6, 1989.

The central issue at trial was whether execution of the "consent" provided reasonable notice of the assignment to defendants. For its case, Southern Floridabanc presented the prior deposition testimony of Adriane Underwood, the testimony of Lawrence Mills who was a Vice President of Southern Floridabanc, and Howard Ferguson.

Underwood's testimony established that she was responsible for obtaining the necessary documentation for Miller's loan from Southern Floridabanc. Underwood stated that she came to Cleveland in June of 1985 in order to obtain Miller's signature on the promissory note for the loan, Ferguson's and Shimrak's signatures on the "consent" agreement, and some additional letters.

With respect to her meeting with Ferguson, Underwood testified that she and Miller met with Ferguson in his office at the Continental West Apartments. The meeting was to obtain Ferguson's signature on the "consent" and the other letters. Underwood also testified that it was her practice to explain documents and that she probably explained the consent document to Ferguson before he signed it. However, she did not specifically remember doing so. Underwood's testimony also revealed that Ferguson had requested that a copy of the consent document be sent to him. Underwood then identified a letter which she had written to Ferguson on June 20, 1985, which provided in relevant part as follows:

"Dear Mr. Ferguson:

"Enclosed are copies of the closing documents for our loan to Philip Miller as you have requested.

"To reiterate the agreements contained therein please consider the following:

" * * *

"2. You will distribute partnership profits owed to Mr. Miller directly to SFB by virtue of his assignment of his partnership interests.

" * * *

"It was a pleasure meeting you and look forward to working with you in the future."

With respect to her meeting with Shimrak, Underwood testified that she and Miller met Shimrak at a lounge in a country club. During this meeting, she was sure that she had explained the "consent" to Shimrak before he signed it.

Lawrence Mills testified that in accordance with Southern Floridabanc's standard procedure concerning correspondence, a secretary types a letter, obtains the signature of the sender, copies it, mails it to the addressee, and then places a copy in the relevant file. Mills' testimony established that a copy of the June 20, 1985 letter from Underwood to Ferguson appeared in his file concerning this matter and that the original had not been returned to Southern Floridabanc.

Howard Ferguson testified for Southern Floridabanc as if upon cross-examination. He stated that he had signed the "consent" and other documents but did so without reading them. However, he indicated that no one prevented him from reading the "consent" document. He further admitted that he conducted business from a sales office at Continental West, but denied receiving Underwood's correspondence to him which was sent to that address.

The defendants presented during their case the testimony of Howard Ferguson's secretary, Delia Lannon, Ferguson, Miller, Shimrak, and Tom Woods, a bank examiner. Delia Lannon testified that Ferguson is extremely organized and that if he were aware of an obligation to forward Miller's partnership distributions to Southern Floridabanc; he would have done so. Lannon further testified that despite language in the June 20, 1985 letter from Underwood to Ferguson which requires PIA, Inc. to send Continental West closing statements, a partnership financial statement, and $81,000, she was never required to forward these materials to Southern Floridabanc.

Howard Ferguson testified concerning the events of the June 5, 1985 meeting with Miller and Underwood. He testified that Miller was in a hurry and explained that the "consent" was needed in order to verify to his creditors

that he had an interest in Continental West. In a prior affidavit, however, Ferguson testified that Miller had placed the "consent" in front of him in a cursory fashion "as if to say, 'Do me a favor, I need this signed, it really doesn't concern you.'" Ferguson further testified that it sounded strange. However, he signed the "consent" and several other documents because he trusted Miller and that he often signs documents without reading them. Ferguson also denied that Underwood had explained the nature of the "consent." Ferguson did note though that he had previously stated that Underwood was not present when Miller presented the "consent" for his signature. Finally, Ferguson admitted that after signing the "consent" he had forwarded three partnership distributions of $100,000 each to Miller.

Philip Miller testified that he did not remember Ferguson or Shimrak being given any explanation regarding the nature of the "consent." He further asserted that he had accepted the partnership distributions contrary to the terms of the "consent." He stated that it never occurred to him to inform PIA, Inc. that the distributions should have been made to Southern Floridabanc.

Peter Shimrak, Chairman of Home Federal Savings Bank of Cleveland, Ohio, testified that he met Miller and Underwood on June 5, 1985 at the Westwood Country Club. His testimony revealed that he signed this document without reading it and without receiving any explanation as to its contents. Shimrak admitted, however, that on the "consent" and other documents, his middle initial had been changed by interlineation from "S" to "E" and that it is possible that he had made this change. Shimrak further claimed that he quite often signs documents without reading them. In this case, he substituted faith and trust in Miller for due care in ascertaining the nature of the "consent" document.

Finally, Tom Woods testified that in his expert opinion Southern Floridabanc should have attempted to obtain the February 1986 partnership distribution to Miller, following Miller's January 1986 default on the loan.

The trial court entered judgment for Southern Floridabanc, concluding that defendants had actual and constructive notice of the assignment and that Southern Floridabanc's notice of the assignment was reasonable under prevailing legal standards.

## II

Shimrak's first assignment of error states:

"The trial court erred in finding that Shimrak, PIA Associates and Professional Investments of America, Inc. had actual notice of an assignment of general partnership profits from Philip Miller to plaintiff-appellee."

PIA, Inc.'s and PIA Assoc.'s first and second assignments of error state:

"The trial court erred in its finding that constructive notice was adequate notice to defendants of the assignment in question.

"The trial court erred in finding, against the manifest weight of the evidence, that appellants had actual notice of Millers' assignment and their obligation to pay appellee, Southern Floridabanc."

■ With respect to our standard of review, we note that judgments supported by some competent and credible evidence will not be reversed by a reviewing court as being against the manifest weight of the evidence. *Seasons Coal Co., Inc. v. Cleveland* (1984), 10 Ohio St.3d 77, 80, 10 OBR 408, 410, 461 N.E.2d 1273, 1276.

With respect to the statutory provisions regarding assignments, we note that R.C. 1309.01 to 1309.50 apply "to any transaction, regardless of its form, which is intended to create a security interest in personal property or * * * accounts." R.C. 1309.02(A)(1).

R.C. 1309.37(C), or UCC 9–318(3), in turn, describes when an account debtor may pay an assignor. It provides:

"The account debtor is authorized to pay the assignor until the account debtor *receives notification* that the amount due or to become due has been assigned and that payment is to be made to the assignee. A notification which does not reasonably identify the rights assigned is ineffective. If requested by the account debtor, the assignee must seasonably furnish reasonable proof that the assignment has been made and unless he does so the account debtor may pay the assignor." (Emphasis added.)

Further, pursuant to R.C. 1301.01(Z):

" * * * A person 'receives' a notice or notification when:

"(1) it comes to his attention; or

"(2) it is duly delivered at the place of business through which the contract was made or at any other place held out by him as the place for receipt of such communications."

R.C. 1301.01(AA) states:

"*Notice, knowledge, or a notice or notification received by an organization is effective* for a particular transaction from the time *when it is brought to the attention of the individual conducting that transaction, and in any event from the time when it would have been brought to his attention if the organization had exercised due diligence.* * * *"* (Emphasis added.)

Finally, R.C. 1301.01(Y) provides:

"A person has 'notice' of a fact when:

"(1) he has actual knowledge of it; or

"(2) he has received a notice or notification of it; or

"(3) *from all the facts and circumstances known to him at the time in question he has reason to know that it exists.*

"A person 'knows' or has 'knowledge' of the fact when he has actual knowledge of it. 'Discover' or 'learn' or a word or phrase of similar import refers to knowledge rather than to reason to know. The time and circumstances under which a notice or notification may cease to be effective are not determined by this section." (Emphasis added.)

The case of *Surety S. & L. Co. v. Kanzig* (1978), 53 Ohio St.2d 108, 7 O.O.3d 187, 372 N.E.2d 602 sets forth the appropriate criteria for proper notification to an account debtor that the account has been assigned and the payment is to be made to the assignee.

■ The Ohio Supreme Court requires the notification to set forth three things. The first is an indication that the account has been assigned. Secondly, the notification must contain a specific direction that payment is to be made to the assignee, rather than the assignor. Thirdly, the notification must contain a reasonable identification of the rights assigned. *Id.* at 112, 7 O.O.3d at 189, 372 N.E.2d at 605.

Furthermore, "the notification must be in such form as to enable the ordinary consumer, or account debtor, to understand from the notification received that the account has been assigned and that payment is to be made to the assignee, rather than the assignor." *Id.*

■ The facts, in the trial of this case, reflect that the three criteria of *Surety* were satisfied. The "consent" signed by Shimrak and the President of PIA, Inc. expressly indicated that Shimrak and the President of PIA, Inc. both acknowledged and consented to the terms and conditions of the assignment of Miller's interests to Southern Floridabanc. This document or notification unequivocally indicated that the account had been assigned. There was also the testimony of Underwood that indicated that it was her standard practice to explain consent documents and she probably did so with Ferguson. She was certain that the consent document was explained to Shimrak prior to him signing it. On these facts, the trial court could very reasonably conclude that the first prong of *Surety* was met since the "consent" and the June 20, 1985 letter both contained an express indication that the account had been assigned.

■ With respect to the second requirement that the notification contain a specific direction that payment is to be made to the assignee, rather than the assignor, this requirement was also satisfied. The language of the "consent" expressly states "until otherwise notified by ASSIGNEE, all Partnership

distributions whatsoever allocable to ASSIGNOR's share of the Partnership shall be made directly to ASSIGNEE." This is a specific direction that payment is to be made to the assignee, rather than the assignor. In addition, the letter of June 20, 1985 contains a specific reiteration of this direction within paragraph number two. It reads "you will distribute partnership profits owed to Mr. Miller directly to SFB by virtue of his assignment of his partnership interests."

■ Finally, the "consent" contains a reasonable identification of the rights assigned. It expressly states that the "Partnership Interest and Proceeds of Phillip S. Miller are assigned to Southern Floridabanc Savings Association * * *." The "consent" document goes on to state that "all Partnership distributions whatsoever allocable to Assignor's share of the Partnership shall be made directly to ASSIGNEE." Finally, the June 20, 1985 letter to Ferguson from Underwood also expressly and reasonably identifies the rights assigned, in paragraph number two. It states that the partnership profits owed to Miller will be distributed to Southern Floridabanc. Therefore, it was reasonable for the trial court to conclude that the third requirement of *Surety* was satisfied.

Lastly, the Ohio Supreme Court makes a general statement concerning the overall form of the notification in *Surety* at 112, 7 O.O.3d at 189, 372 N.E.2d at 605:

"The notification must be in such form as to enable the ordinary consumer, or account debtor, to understand from the notification received that the account has been assigned and that payment is to be made to the assignee, rather than the assignor."

■ Based upon the "consent" and the letter of June 20, 1985, it was a very reasonable conclusion by the trial court that the notification of the subject assignment met the legal criteria. The notification, in this case, contained an indication that the account had been assigned. It also contained a specific direction that payment was to be made to Southern Floridabanc rather than Miller. There was also a reasonable and express identification of the rights assigned. Finally, the notification was in a form that enabled the account debtor to understand from it that the account had been assigned and that payment of Miller's partnership proceeds was to be made to Southern Floridabanc rather than to Miller.

It has also been established as it is relevant to notice that:

" 'A person of ordinary mind cannot say that he was misled into signing a paper which was different from what he intended to sign when he could have known the truth by merely looking when he signed. * * * If a person can

read and is not prevented from reading what he signs, he alone is responsible for his omission to read what he signs.' *Dice v. Akron, Canton & Youngstown RR. Co.* (1951), 155 Ohio St. 185, 191, 44 O.O. 162, 164, 98 N.E.2d 301, 304, reversed on other grounds (1952), 342 U.S. 359 [72 S.Ct. 312, 96 L.Ed. 398, 47 O.O. 53]; *McCuskey v. Budnick* (1956), 165 Ohio St. 533, 535, 60 O.O. 493, 494, 138 N.E.2d 386, 388." *Haller v. Borror Corp.* (1990), 50 Ohio St.3d 10, 14, 552 N.E.2d 207, 210.

■ With respect to the sufficiency of notice where the account debtor signed a document which notifies him of an assignment, but allegedly did not read, it has been stated that adequate notice will be established where: (1) the substantively correct notice has been read, verbatim, to the account debtor; (2) the circumstances are such that the account debtor was able to read the notice at the time it was presented to him for signature; or (3) a copy of the notice is left with the account debtor. See *Warrington v. Dawson* (C.A.5, 1986), 798 F.2d 1533, 1537, fn. 3.

■ Applying the foregoing, we hold that the trial court erred in stating that the notice requirement of R.C. 1309.37(C) could be established through "constructive notice." However, from the evidence presented below, and the substance of the trial court's opinion, it is clear that the trial court did not use the term "constructive notice" to mean notice achieved through the filing of a financing statement, but rather, used the term to mean implied actual notice, based upon circumstances which gave defendants reason to know that there had been an assignment. Accordingly, any error from the court's use of the term constructive notice is not prejudicial.

■ Furthermore, we conclude that there is competent, credible evidence to support a finding that the defendants had both actual notice and implied actual notice. It is undisputed regarding the existence of actual notice that both Ferguson and Shimrak signed the "consent" documents which provided express language that Miller's partnership distributions had been assigned. It was further established that despite defendants' claims that they did not read the document, they were nonetheless able to read it at the time it was presented for signature. Also on the existence of implied actual notice, Underwood's deposition testimony competently and credibly established that it was her practice to explain documents and that it was more probable than not that she explained the nature of the "consent" to both defendants in this instance. In addition, it is probable that follow-up correspondence was sent to Ferguson which further apprised him of the assignment. Further, this letter was correctly directed to Ferguson's sales office at Continental West, as the "consent" was signed at this location, satisfying R.C. 1301.01(Z)(2).

Moreover, we defer to, and also concur in, the trial court's determination that defendants' claim that they had no actual notice of the "consent" is not plausible, in light of both their business experience and the modification in the "consent" which was clearly attributable to Shimrak.

Shimrak's first assignment of error, and PIA, Inc. and PIA Assoc.'s first and second assignments of error are overruled.

## III

Shimrak's second and third assignments of error state:

"The trial court erred in holding that as a matter of law, constructive notice of an assignment of general partnership profits from Philip Miller to plaintiff-appellee was not and could not be rebutted by Shimrak and defendants-appellants.

"The trial court erred in holding that as a matter of law, Shimrak and defendants-appellants were not entitled to rebut receipt of notice of an assignment of general partnership profits from Philip Miller to plaintiff-appellee by asserting the misrepresentations of the assignor (Philip Miller) and assignee (plaintiff-appellee)."

Within these assignments of error, Shimrak claims that the trial court erred in holding that the evidence of implied actual notice could not be rebutted, as a matter of law, by evidence of alleged misrepresentations concerning the nature of the "consent" document.

The trial court clearly permitted introduction of rebuttal evidence regarding the alleged misrepresentations. Further, the court's opinion does not state that such evidence was not permissible, but instead concludes that the rebuttal evidence offered was not credible. Thus, these claims lack a factual basis in the record and are accordingly overruled. *L.A. & D. v. Bd. of Commrs.* (1981), 67 Ohio St.2d 384, 388, 21 O.O.3d 242, 244, 423 N.E.2d 1109, 1112.

## IV

Shimrak's fourth assignment of error states:

"The trial court erred as a matter of law in holding that the notice of assignment given to Shimrak by plaintiff-appellee was reasonable and sufficient under controlling UCC standards."

PIA, Inc.'s and PIA Assoc.'s third assignment of error states:

"If the trial court's decision can be construed to include a finding that such steps as appellee took to give notice to appellants were legally sufficient, then

the trial court erred, because such a finding is contrary to law and manifestly against the weight of the evidence."

Defendants next claim that the notice was not sufficient, since they did not read it, there were alleged misrepresentations as to the nature of the document, and it was substantively insufficient.

As noted previously, an assignment is effective when the account debtor "receives notification" of the assignment. R.C. 1309.37(C). Here, Ferguson and Shimrak clearly received notification of the assignment when they signed the "consent" document.

Defendants further claim that the manner of notice was not reasonable since they did not read it, there were alleged misrepresentations as to the nature of the document, and no copies of the document were given to them. As noted previously, however, adequate notice was established since defendants were able to read the notice when it was presented to them. See *Warrington v. Dawson, supra.*

Finally, the assignment is substantively correct for the reasons discussed earlier.

These assignments of error are overruled.

## V

PIA Inc.'s and PIA Assoc.'s final assignment of error states:

"The trial court erred by finding, against the manifest weight of the evidence, that appellee bank did not waive its right to receive partnership distributions."

 Lastly, defendants claim that pursuant to the Official Comment to UCC 9–318(3), Southern Floridabanc has waived its entitlement to the partnership distributions by waiting until Miller had defaulted upon the loan before seeking the distributions from defendants.

The Official Comment provides:

"3. Subsection (3)[ (C) ] clarifies the right of an account debtor to make payment to his seller-assigner in an 'indirect collection' situation (see Comment to Section 9–308 [RC 1309.27]). So long as the assignee permits the assignor to collect claims or leaves him in possession of chattel paper which does not indicate that payment is to be made at some place other than the assignor's place of business, the account debtor may pay the assignor even though he may know of the assignment. In such a situation an assignee who wants to take over collections must notify the account debtor to make further payments to him."

Case law which construes this passage indicates that waiver occurs only where an account debtor has not receive actual notice of the assignment. See *Manes Construction Co., Inc. v. Wallboard Coatings Co., Inc.* (Texas App. 1973), 497 S.W.2d 334, 338; *American Bank of Commerce v. McAlester* (Okla.1976), 555 P.2d 581, 586. See, generally, Anderson, Uniform Commercial Code (3 Ed. 1985) 368, Section 9–318:22.

These assignments of error are overruled.

*Judgment affirmed.*

MATIA, P.J., and HARPER, J., concur.